R. B. DAVIS ET AL V. CITY OF LUBBOCK AND URBAN RENEWAL AGENCY OF THE CITY OF LUBBOCK, TEXAS.

No. A-7072. Decided July 15, 1959.
(326 S.W. 2d Series 699)

*Treadaway & Blumrosen* and *Gordon Treadaway*, for R. B. Davis, and *Saw & Daniel* and *Roderick L. Shaw*, for George and Vera Lee Johnson, appellants.

*Vaughn E. Wilson*, City Attorney, *Worth Fullingim*, Assistant City Attorney, for City of Lubbock, *Klett, Evans, Trout & Jones, Bobby J. Moody* and *Wm. A. Evans*, for Urban Renewal Agency, appellee.

MR. JUSTICE GREENHILL delivered the opinion of the Court.

This direct appeal involves certain basic constitutional questions regarding the validity of the Texas Urban Renewal Law.[1] The most difficult questions before us are (1) whether the condemnation of property under the Act constitutes a taking for a "public use," and (2) the validity of the "trial de novo" provision of the Act which, as applicable here, would require an independent trial in court on the question of whether the area to be cleared as in fact a slum as defined in the Act.

1   The general purpose of the Urban Renewal Law is to provide for the clearance of slum and blighted areas in cities and the redevelopment of the areas by private entrprise under restrictions dsigned to carry out the plan of renewal and to prevent recurrence of the slum conditions.

The parties waived a jury, and the district court upheld the Act. Section 17 of the Act, however, which requires a complete trial de novo in court, was declared to be invalid. The trial court nevertheless upheld the actions of the City and the Renewal Agency upon the validity of other portions of the Act and upon findings that the actions of the City and the Agency were fair and reasonable.

We agree with the trial court that, as against the attacks here

---

1.—Acts 55th Leg., 1957, p. 704, ch. 298, codified as Article 12691-3, Vernon's Ann. Texas Civ. Stat.

made, the Act is constitutional. We agree that the trial de novo portion of the statute is invalid as applied to the matter before us.

R. B. Davis brought this suit against the City of Lubbock and its Urban Renewal Agency to enjoin them from instituting proceedings in eminent domain against his property, from levying any taxes, or expending any public funds upon the urban renewal project. Intervenors George Johnson and wife adopted Davis' pleadings and demanded a trial de novo on the question set out above.

The Congress provided the stimulus for these slum clearance and urban renewal statutes by providing large sums of money for such projects to be carried out by the cities under enabling state legislation.[2] The federal government furnishes two-thirds of the net project cost. No local tax funds have been spent on the Lubbock project as yet. Briefs filed herein by several other Texas cities and other amici curiae indicate that several other urban renewal projects are under way in Texas.[3]

The Urban Renewal Law, the substance of which has been enacted in most of the states of the Union,[4] is too long to be reviewed here. The Texas Act, filling 18 pages of the Session Laws, contains more limitations upon the powers of cities and renewal agencies than are contained in the laws of other states. For example, the Texas law provides that no city may exercise any of the powers until the city council shall have held an election by the people of the city as to whether (1) one or more slum or blighted areas exist in such cities, and (2) slum clearance and rehabilitation of such area is necessary in the interest of public health, safety, morals or welfare. The Texas Act has also a provision, Section 22, not found in other Urban Renewal Act:

"Provided, however, the original owner from which property was acquired hereunder by condemnation or through the threat of condemnation, shall have the first right to repurchase at the price at which same shall be offered."

---

2.—Housing Act of 1949, 63 Stat. 414, 42 U.S.C.A. Sec. 1451 et seq.; Housing Act of 1954, 68 Stat. 623, 42 U.S.C.A. Sec. 1452.

3.—Briefs amicus curiae were filed on behalf of the cities of Austin, Grand Prairie, Port Arthur, San Antonio, and Waco.

4.—"Redevelopment statutes have been enacted (or redevelopment has been permitted by city charters) in 40 states, 4 territories and the District of Columbia." 8 Hastings Law Review at page 242, setting out the statutes in an appendix.

The city council is to determine whether slum areas exist. It must identify the boundaries of such areas and cause a plan to be prepared to combat the problem. Before it may put such plan into operation, it must hold a public hearing after due notice. Thereafter, the council may adopt the plan.

The Act authorizes the city councils themselves to carry out the program. Or they may cause it to be carried out by an "urban renewal agency," a group of from five to nine persons appointed by the mayor with the advice and consent of the council. The Act itself creates such a public body in each city, but a resolution of the city council is necessary to bring it into activity.

The Act authorizes the cities to acquire the land within the designated area by purchase or by condemnation. The area may be cleared and redesigned. The city may retain all or any part of it for its own use. The balance may be leased or sold under terms and conditions designed to prevent the recurrence of slums. The Act forbids the use of the property for public housing.

An election was duly called in Lubbock, and the people voted in favor of proceeding under the Act. It is stipulated that the necessary procedural steps have been taken and that the Council had created the Urban Renewal Agency. The City and the Agency have declared an area in southeast Lubbock, now designated as the Coronado Urban Renewal Project Area, to be a "slum area." In addition, the area was found to contain "other blighting characteristics such as physical deterioration, inadequate street system and unsanitary conditions * * * ."

R. B. Davis owns land within that area. The structure thereon is not standard and does not meet the minimum requirements of the City's building code. The intervenors, Johnson and wife, also own property within the area, but the structure on their property is standard. It meets the requirements of the building code. Under the City's plan of redevelopment, it will be necessary to acquire both of their properties by purchase or condemnation.

The City Council's resolution finds, in effect, that typical slum conditions exist: of the 256 residential structures in the area, all are substandard except 7; over 80% are dilapidated beyond reasonable rehabilitation; 100% of the nonresidential structures are substandard and nuisance-producing. The substandard struc-

tures are so unsafe and unsanitary as to be unsuitable for human habitation; 203 of them have open, unprotected and dangerously inadequate wiring; 109 have no running water; 105 have no indoor commode. Most of the houses are badly overcrowded.

The resolution further finds a high rate of crime in the area including a disproportionately high percentage of arrests for intoxication. While the average for treatment of venereal disease was only one person in 1000 in the rest of the city, the average was 20 to 1000 within the area. The City spent for police, fire and other services $3\frac{1}{2}$ tax dollars within the area for each tax dollar received from it. The cost of fire calls within the area was substantially higher than in the rest of the city.

We now turn to the attacks on the validity of the Act.

I. *The Property is not taken for "Public Use."*

**2** The most serious attack on the Act is that it violates Section 17 of Article 1 of the Texas Constitution which reads in part:

"No person's property shall be taken, damaged or destroyed for or applied to *public use* without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money * * *."

This "public use" provision, in substance, appears in the constitutions of almost all of the states and is implied in the 14th Amendment to the Constitution of the United States.[5] Under it, private property may be taken only for adequate compensation and for a "public use."

The question of "public use," as far as the due process of the federal constitution is concerned, has been settled. The Supreme Court of the United States in 1954 upheld the Urban Renewal Act of the District of Columbia, a law broader than the Texas Act.[6]

Acts similar to ours have also been upheld by a great ma-

---

5.—*City of Cincinnati v. Vester*, 33 Fed. 2d 242, 68 A.L.R. 831, aff'd. 1930, 281 U. S. 439, 74 L. Ed. 950, 50 Sup. Ct. 360; Nicholas Eminent Domain (3rd ed.), Sec. 7.1(3) and 4.7.

6:—*Berman v. Parker*, 1954, 348 U. S. 26, 53 Mich. L. Rev. 883 (1955; 1955 U. of Ill. L. Forum 145 (1955); criticized: 41 A.B.A.J. 501 (1955). See also comment, 2 N.Y.L. Forum 104 (1956); note, 40 Iowa L. Rev. 659 (1955).

jority of the courts of last resort in the other states.[7] They are persuasive as are the numerous text and law review articles on the subject.[8] We must nevertheless consider the question in the light of our own constitution as it has been interpreted by this Court.

We are met at the threshold with a declaration of the Texas Legislature that the entire project is a "public use." It has declared that the carrying out of the urban renewal program, including the acquisition of the land, the clearing of slum and blighted areas, and the disposition of the property *"are public uses and purposes* for which public money may be expended and the power of eminent domain exercised."[9]

The Legislature, in support of its declaration of "public use," found there existed in our cities slum and blighted areas which constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and welfare of the residents of the State; that such areas contribute substantially and increasingly to the spread of crime, disease and juvenile delinquency; that such areas necessitate excessive and disproportionate expenditures for the preservation of the public health and safety and for adequate police and fire protection. It declared that the menace can best be remedied by the conjunctive action of private enterprise, the cities (through their regulatory and other powers) and other public bodies acting pursuant to urban renewal plans.

**3** This Court, however, in previous cases, has held that whether

7.—The validity of similar legislation has been upheld in over 20 states and the District of Columbia. Of these, Maryland, Missouri, New Jersey and New York have special constitutional provisions. The New Jersey Court, however, said it would have upheld the act even without the additional constitutional provision. *Wilson v. City of Long Beach* (1958), 27 N.J. 360, 142 Atl. 2d 837. It has been declared invalid in 3 states, one of which has adopted the measure subsequently by constitutional amendment. Rhyne, Municipal Law (1957), p. 520, and annotation 44 A.L.R. 2d 1414 (1955).

8.—2 Nichols on Eminent Domain (3rd ed., 1950) Sections 7.223, 7.5156(3); Rhyne, *Municipal Law*, pp. 520-524, Sec. 25-3; Mandelker, "Public Purpose in Urban Redevelopment," 28 Tulane Law Review 96 (1953); Brown, "Urban Redevelopment," 29 Boston U. Law Review (1949); Sogg and Wertheimer, "Urban Renewal: Problems of Eliminating and Preventing Urban Deterioration," 72 Harvard Law Review 504 (1959); Kitchen, "What Use is a Public Use in Eminent Domain?" 4 St. Louis U. L.J. 316 (1957); Jacobs and Levine, "Redevelopment: Making Misused and Disused Land Available and Usable," 8 Hastings Law Journal 241 (1957); Hill, "Recent Slum Clearance and Urban Redevelopment Laws," 9 Washington & Lee Law Review 173 (1952); Siegel, "Slum Prevention—A Public Purpose," 35 Chicago Bar Record 151 (1954); and see, among others, Comments and Notes 54 Yale L.J. 116 (1944); 68 Harvard L. Rev. 1422 (1955); 101 U. of Pa. L. Rev. 411, 1246 (1953); 43 Geo. L.J. 298 (1955); 41 Minn. L. Rev. 219 (1957).

9.—Section 2 of the Urban Renewal Act, supra note 2.

a taking of property is for "public use" is a judicial question.[10] In *Housing Authority of Dallas v. Higginbotham,* it was said that the declaration of the Legislature was entitled to great weight; and since in that case the Court could not say as a matter of law that the unsanitary and unsafe dwellings did not cause and increase spread of disease and crime in the slum areas of Dallas there before the court, this Court could not say that the legislative determination was manifestly wrong.[11] We shall, therefore, regard this question as a judicial one, giving great weight, however, to the legislative determination.

The slum clearance statute in *Housing Authority of Dallas v. Higginbotham* was similar to the one now before us except that it provided for public housing on the cleared area instead of redevelopment by private enterprise. Following the above rule, this Court held that the taking, for adequate compensation, of property for slum clearance was for a "public use.[12] This Court there said, "The primary purpose of the Housing Authorities Law is to eliminate slums, from which the entire community derives a benefit through the elimination of conditions giving rise to crime and disease."

Those attacking the Act here argue, however, that the *Dallas-Higginbotham* case is distinguishable because the governmental agency retained the title and leased the apartments to members of the public. They point out that here, after clearance, the property may be sold as well as leased to members of the public. If this were all that the Act provided, this case would be much more difficult. The cities, on the other hand, point out that the Act provides that the land may be sold only upon such necessary terms, covenants, conditions, and zoning ordinances

---

10.—*Housing Authority of Dallas v. Higginbotham,* 135 Texas 158, 143 S.W. 2d 79 at 84, 100 A.L.R. 1053 (1940);*L.M.S. Inc. v. Blackwell,* (1950) 149 Texas 348, 233 S.W. 2d 286 at 290; *West v. Whitehead,* Texas Civ. App. (1922), 238 S.W. 976 (wr. ref.)

11.—Supra note 10, at page 85 of 143 S.W. 2d. Similarly in the *West* case, supra note 10, in which a writ of error was refused, it was said that while the question was a judicial one, "Where the Legislature declares a particular use to be a public use, the presumption is in favor of this declaration, and will be binding upon the courts unless such use is clearly and palpably of a private character."

In *City of Corsicana v. Wren,* 159 Texas 202, 317 S.W. 2d 516 (1958), this Court held that a similar legislative determination (in a field in which it is equally competent to decide) was not exclusively a judicial function but was also a legislative function which the courts may review, but which ought to be respected by the courts unless the legislative classification is "arbitrary or clearly at variance with 'well established and well defined' law on the subject * * *." The writer and three other justices disagreed with the majority on this point.

12.—In all but two of the states which have approved the constitutionality of urban redevelopment, the slum-clearance-low-rent-public-housing laws had been previously upheld. 28 Tulane Law Review at 99.

as will prevent, for the foreseeable future, the recurrence of the slum conditions, and that the purchaser must redevelop the property, not in accordance with his own desires, but in accordance with the plan adopted by the city.

One of the early acts of the Republic of Texas was to condemn land for resale to private individuals. The Texas Congress in 1839 created a commission to select and obtain, by purchase or condemnation, a site for the permanent location of the seat of government "at some point between the rivers Trinidad [Trinity] and Colorado and above the old San Antonio Road."[13]

Under that law, approximately 1½ leagues were to be surveyed, divided into town lots, advertised for sale, and sold to the highest bidder, provided that "before the sale of said lots [the agents of the Republic] shall set apart a sufficient number of the most eligible [lots] for a Capitol, Arsenal, Magazine, University," et cetera. The site selected is, of course, now a part of the City of Austin.

Those early condemnation proceedings occurred at Bastrop. Thereafter a dispute arose between persons owning rights under a patent previously issued and located on this site and those holding under the purchasers at the condemnation sale. The question of public use was raised. It was held in *Smith v. Taylor*[14] that those purchasing under the condemnation proceedings held good title.

The opinion in that case was written in 1871, just a few years prior to the debates in the Texas Constitutional Convention of 1875 leading to our present Constitution of 1876. The wording of the Constitution of the Republic of Texas was that "No person's * * * property [shall be] taken or applied to *public use,* unless by consent of himself * * * without just compensation * * * ."[15] The wording was only slightly changed in the first constitution of the State of Texas in 1845.[16] The same provision was brought forward in the Constitutions of 1861, 1866, and 1869.[17] So the Constitution Convention of 1875 had before

13.—Laws of the Republic 1839, p. 165; 2 Laws of Texas 165.

14.—34 Texas 589, (1870-71), cited with approval in *Travis County v. Trogden,* 1895, 88 Texas 302, 31 S.W. 358 (by Justice Denman). The case is cited here to show what was before the Constitutional Convention of 1875.

15. Section 13, Declaration of Rights, Constitution of the Republic, 1836. Emphasis throughout is ours.

16.—Section 14 of Art. 1: "* * * No person's property shall be taken or applied to public use, without adequate compensation being made, unless by the consent of such person."

17. Section 14, Art. 1, without change, of each constitution.

it the language of the previous constitutions and the interpretation of the court in *Smith v. Taylor*. The reports of the debates in the Constitutional Convention are not full. But from the records available to us, the debates centered around these changes: (1) the insertion of the words "damaged or destroyed for" between "taken * * * or applied for" public use; and the addition of the clause that when taken, except for the use of the State, the compensation should be first made or secured.[18] No reference is made to any discontent over the condemnation of private land for the seat of the government with sale of lots to the highest bidder to private individuals. The provision regarding "public use" was readopted, as far as this question is concerned, in the present Constitution of 1876.

The words "public use" have not been given a precise definition. The courts of some states have given them a broad meaning to include public benefit, advantage, or welfare.[19] Others have given it a restricted view, holding "public use" to mean actual occupancy by the public.[20]

In *Borden v. Trepalacios Rice & Irrigation Co.*, 98 Texas 494, 86 S.W. 11, 14, this Court said in 1905:

"* * * we are not inclined to accept the liberal definition of the phrase 'public use' adopted by some authorities, which makes it mean no more than the public welfare or good * * *. We agree that property is taken for public use * * * only when there results to the public some definite *right* or use in the business or undertaking to which the property is devoted."

The holding of that case was, however, that the condemnation of private lands by a private canal corporation to deliver water under contract to 26 private individuals was a "public use."

In 1922, this Court refused a writ of error in *West v. Whitehead*, Texas Civ. App., 238 S.W. 976. There the condemnation of

18.—McKay, *Debates in the Constitutional Convention of 1875*, p. 237, The University of Texas, 1930.

19.—E.G., California: *Redevelopment Agency of San Francisco v. Haynes*, 122 C.A. 2d 777; Kansas: *State v. Urban Renewal Agency* (1956), 296 P. 2d 656; Maine: *Crommett v. City of Portland* (1954), 107 A. 2d 841; New Jersey: *Redfern v. Board of Commissioners of Jersey City* (1948), 59 A. 2d 641; New York: *Murray v. La Guardia* (1943), 52 N.E. 2d 884; Ohio: *State v. Rich*, (1953) 110 N.E. 2d 778; Rhode Island: *Opinion to Governor* (1949), 69 A. 2d 531.

20.—Georgia: *Housing Authority of Atlanta v. Johnson* (1953), 74 S.E. 2d 891; South Carolina: *Edens v. City of Columbia* (1956), 91 S.E. 2d 280.

a strip of West's land so that a railroad could put down 8 miles of track from a main line to a private asphalt mine was upheld as a "public use."

In the recent *Pate* case,[21] this Court held:

"No hard and fast rule can be laid down for determining public use * * * and each case is usually decided upon the basis of its own facts * * *.

"* * * As pointed out in Housing Authority of City of Dallas v. Higginbotham, supra, this Court has adopted a rather liberal view as to what is or is not a public use. On the other hand, we have refused to accept the definition adopted by some authorities which makes the phrase mean nothing more than public welfare or good and under which almost any kind of business which promotes the prosperity or comfort of the community might be aided by the power of eminent domain." [citing the *Trespalacios* case].

Rather close in point is *Atwood v. Willacy County Navigation District,* 271 S.W. 2d 137 (1954), writ refused n.r.e. There the navigation district condemned 1760 acres for the construction of Port Mansfield. The plans included the condemnation of land *for leasing to private firms for industrial sites.* It was vigorously contended before the Court of Civil Appeals, and in the first point of error before this Court, that, under the language of the *Trespalacios* case, condemnation of private property to be leased to other individuals was not a "public use." The Court held that it was.

With the above cases as a background, the Legislature has sought to assure that the public will have certain substantial rights in this land after its resale, and that it will not become subject to unqualified personal use. It has done so at least to the extent that we cannot say its actions are manifestly wrong. Under the Act, the property may not simply be resold for private use; it must be sold subject to restrictions and covenants which are designed to insure that (1) the plans for renewal will be carried out, and (2) that the slum conditions will not reoccur within the foreseeable future. Thus Section 11 provides that such property may be disposed of.

---

21.—*Coastal States Gas Producing Co. v. Pate,* (1958), 158 Texas 171, 309 S.W. 2d 828, at 833; see also *Housing Authority of City of Dallas v. Higginbotham,* supra note 10.

"* * * subject to such covenants, conditions, and restrictions, including covenants running with the land, as it may deem * * * necessary to carry out the purposes of this Act, all of which shall be written into the instrument transferring or conveying titles * * *. The purchasers or lessees and their successors and assigns shall be obligated to devote such real property only to the uses specified in the urban renewal plan * * * .

"* * * Prior to the advertising for * * * sale of any real estate the city shall adopt as part of the specifications * * * the conditions that will be binding upon the purchaser, his heirs, assigns or successors in title * * * ."

It is further provided that all purchasers, lessees and subsequent purchasers will take the land subject to "the restrictive covenants with respect to the use and improvement of said land * * *."

Even among those states using the strict interpretation of "public use," the great majority have upheld acts similar to the one before us. They have concluded that the impression of the requirements that the land be sold subject to such covenants, restrictions and zoning restrictions as will insure that the redevelopment plan will be carried out and that the property will not again become a slum or blight area within the foreseeable future does place upon the property such a public right or use as will support the taking.[22]

Thus, in *Foeller v. Housing Authority of Portland* (1952), 198 Or. 205, 256 P. 2d 752, the Supreme Court of Oregon first announced its adherence to the strict definition of "public use" as being synonymous with "use by the public;" that public use "means a more intimate relationship between the public and an item of property which has been acquired under the power of eminent domain than is denoted by terms such as 'public bene-

---

22.—California: *Redevelopment Agency v. Hayes* (1954), 122 Cal. App. 2d 777 at 803, 266 Pac. 2d 105 at page 122, Connecticut: *Gohld Realty Co. v. City of Hartford* (1954), 141 Conn. 135, 104 A. 2d 365; Missouri: *State v. Land Clearance Authority*, 364 Mo. 974, 270 S.W. 2d 44; New Hampshire: *Velishka v. City of Nashua* (1954), 99 N.H. 161, 106 A. 2d 571; Tennessee: *Nashville Housing Authority v. City of Nashville* (1951, 192 Tenn. 103, 237 S.W. 2d 946.

Other courts hold that "public purpose" requirement is satisfied with the slum clearance itself and that the subsequent sale is simply incidental. Some of these courts find it unnecessary to consider what happens to the property after resale. For example, "The achievement of the redevelopment of slum and blight areas * * * constitutes a public use * * * *regardless of th use which may be made of the property after the redevelopment has been achieved.*" *People ex rel. Gutknecht v. City of Chicago* (1954), 3 Ill. 2d 539, 121 N.E. 2d 791 at 795. See also *Berman v. Parker*, 348 U.S. 26 at 34, 75 Sup. Ct. 98, at page 103, 99 L. Ed. 27.

fit' and 'public utility.' 'Public use' demands that the public's use and occupation of the property must be direct." The Court said:

"If the challenged statute contemplated that the Housing Authority should do no more than acquire, through the power of eminent domain, the property which comprises a project area, and then sell it to private parties who could do with it whatever they chose, the statute, obviously would be invalid."

The Court held, however, that the sale of property subject to such terms, covenants, and conditions as would insure the carrying out of the redevelopment plan and the prevention of the return of the slum conditions did impress a public right and use on the land:

"* * * Clearly, the public will have the use of the property while the old structures are being wrecked and while the 'site improvements,' of which the complaint speaks, are being made. During that period the property will be devoted to the public's occupancy and use. Tearing down the old structures and making the site improvements are not, however, the most important of the operations that will take place in the transition of the property's use. The matter of greatest consequence will be the transformation to which the entire tract will be put, and the disappearance from the area of conditions which breed vice, disease, delinquency and an undue number of fire calls. It may be that the public's ownership of the property will not be for a long period, but the length of the period is unimportant unless it in itself indicates that acquirement of the fee is unnecessary and that some other estate in the property would serve equally well. The plaintiffs do not contend that a lesser interest in the property would suffice for the purposes of the act. It will be recalled that placing in the deeds of reconveyance conditions and covenants to prevent the recurrence of blight is one of the principal means by which the act seeks to achieve its purposes. Therefore, the acquisition of the fee appears to be essential."

Similarly, in *Hunter v. Norfolk Redevelopment & Housing Authority* (1953), 195 Va. 326, 78 S.E. 2d 893, 899, the highest court of Virginia upheld the Act as against the contention that it simply provided for the taking of property from one person and selling it to another. That court said:

"The contention of the condemnees that the taking of their property is for private use misconceives the nature and extent

of the public purpose which is the object of this legislation. The primary purpose of the taking is the eradication of 'blighted or deteriorated areas.' 'including slum areas,' the reconstruction and rehabilitation of the areas, *and the adaptation of them to uses which will prevent a recurrence of the blighted or slum conditions * * *.*

"The reasoning of the courts which have adopted the majority view is that the primary purpose of the legislation is the elimination and rehabilitation of the blighted and slum sections of the cities, that such purpose falls within the conception of public use, and that when the need for public ownership which occasioned the taking has terminated it is proper that the land be transferred to private ownership, *subject to such restrictions as are necessary to effectuate the purposes of the act and prevent the recurrence of the unwholesome conditions.*"

We recognize that the courts of Georgia and South Carolina have held, contrary to the great weight of authority, that the acts are unconstitutional.[23] The people of Georgia have subsequently amended their constitution, and an urban renewal statute is now in effect there.[24]

Similarly, the Florida Supreme Court, by a divided court, in its first encounter with urban renewal, said the whole scheme was "a real estate promotion for private, commercial and industrial purposes * * *."[25] That court apparently changed its views in a later case. In 1958 it upheld the expenditure of public funds on the Clay County Development Authority to acquire land, a large portion of which was to be resold to private individuals. As to this latter project, the court said that there was nothing in the Act which showed that resale was the primary purpose of the Act and that, "We have no doubt that the [Authority] * * * will serve a valid public purpose * * * ."[26]

We respect the holdings of these courts, but we agree with the holdings of the great majority of American courts to the contrary. We must ascribe to our Legislature a primary purpose of the Act to clear slum and blighted areas. There is nothing in the Act to convict the Legislature of participating in any scheme

23.—*Housing. Authority of Atlanta v. Johnson* (1953), 74 S.E. 2d 891, criticized 15 Georgia Bar Journal 486 (1953); *Edens v. City of Columbia* (1956), 228 S.C. 563, 91 S.E. 2d 280, criticized 41 Minn. L. Rev. 219 (1957); noted 16 Maryland L. Rev. 172 (1956), 2 N.Y. Law Forum 104 (1956); and 8 South Carolina Law Quarterly 457 (1956).

24.—Rhyne, *Municipal Law*, p. 521.

25.—*Adams v. Housing Authority*, (Fla. 1952), 60 So. 2d 663.

26.—*State v. Cotney*, 104 So. 2d 348.

or fraud for the benefit of real estate people or anyone else. We, therefore, uphold its declaration of public use," as applied to the facts and question before us.

## II.  *Are public funds expended on the project expended for a "public purpose?"*

4  Appellants attack the statute on the additional ground that it would result in the unconstitutional use of public funds. They cite Sec. 3 of Art. 8 of our Constitution providing that, "Taxes shall be levied and collected * * * for *public purposes* only."

The words *"public purposes"* are no narrower than the words "public use" discussed at length above. Since we have held property is taken for public use, it follows that the expenditure of funds on the same project would be for public purposes. Here again the legislative determination of public purposes is highly persuasive.

This Court has held that:

"No exact definition can be made [of public purposes]. Suffice it to say that, unless a court can say that the purposes for which funds are expended are clearly not public purposes, it would not be justified in holding invalid a legislative act or provision in a city charter providing funds for public purposes."[27]

This question has been raised in almost all of the urban renewal cases in other states, and it has been held that the tax money spent on the project has been for public purposes."

## III.  *May the property be resold for its fair value?*

5  Appellants contend that the property purchased by the City in the slum area may not be resold at its "fair value" which might be less than the cost of acquisition and clearance of such land [29] because that would constitute the gratuitous and unconstitutional granting of public money to individuals.[30]

27.—*Davis v. City of Taylor*, 123 Texas 39, 67 S.W. 2d 1033. See also *Goodnight v. City of Wellington*, 118 Texas 207, 13 S.W. 2d 353 (1929).

28.—*Gohld Realty Co. v. City of Hartford* (1954), 141 Conn. 135, 104 A. 2d 365; *Randolph v. Wilmington Housing Authority* (Del. 1958), 139 A. 2d 476, at 484; *State v. Rich*, (1953), 159 Ohio St. 13, 110 N.E. 2d 778; *Land Clearance Authority v. City of St. Louis* (Mo. Sup. 1954), 270 S.W. 2d 58, at 64.

29.—Section 11(a) reads in part: "Such real property or interest shall be sold, leased, or otherwise transferred, or retained at not less than the fair value for uses in accordance with the urban renewal plan."

30.—Section 52 of Art 3, Texas Constitution.

This point has been raised in most of the urban renewal cases. It has been uniformly held that the resale of the property at its fair value is not a gratuity or an extension of public credit.[31]

The Act requires that all property be sold under competitive sealed bids after advertising. The property is not simply sold for just any use. It is to be sold subject to the covenants, restrictions, and uses of the renewal plan. As stated by the Supreme Court of Missouri, "It would be difficult to imagine a workable law that would exact more from a purchaser than a 'fair value' price."[32] The point is overruled.

### IV. May the Legislature create the agency as a body politic and corporate?

6 Appellants challenge the authority of the Legislature to create a public body corporate and politic to be known as an Urban Renewal Agency. They argue that the Legislature may create only those bodies politic specifically set out in the Constitution or which are authorized to conserve natural resources under Section 59 of Article 16 of our Constitution. They cite no authority to support their views, and we have found none.

On the contrary, this Court upheld the delegation of authority to, and the actions of, the Housing Authority of Dallas in that slum-clearance-low-cost housing case.[33] An analogous attack was made upon the National Guard Armory Board, a body politic and corporate,[34] and upon the Texas Turnpike Authority. In both instances, the existence of the agencies and the delegation of authority to them was upheld.[35] In the *Turnpike*

31.—*Velishka v. City of Nashua*, 1954, 99 N.H. 161, 106 A. 2d 571, 44 A.L.R. 2d 1406, *Ajootian v. Providence Redevelopment Agency*, 1952, 80 R.I. 73, 91 A. 2d 21; *Opinion of the Justices*, 1950, 254 Ala. 343, 48 So. 2d 757 at 761; *Rowe v. Housing Authority of Little Rock*, 1952, 20 Ark. 698, 249 S.W. 2d 551; *Randolph v. Wilmington Housing Authority*, Del. 1958, 139 Atl. 2d 476, at page 486, *Foelker v. Housing Authority of Portland*, 1953, 198 Or. 205, 256 P. 2d 752 at 781; *Redevelopment Agency v. Hayes*, 1954, 122 Calif. App. 777, 266 P. 2d 105, cert. den. 348 U.S. 897; *In re Slum Clearance in the City of Detroit*, 1951, 331 Mich 714, 50 N.W. 2d 340 at 344; *David Jeffrey Co. v. Milwaukee*, 1954, 267 Wisc. 559, 66 N.W. 2d 362 at 379; and see Case Note 39 Va. L. Rev. 236.

32.—*State v. Land Clearance for Redevelopment Authority of Kansas City*, 1954, 364 Mo. 974, 270 S.W. 2d 44 at 53; see also *Land Clearance for Redevelopment Authority v. St. Louis* (Mo. Sup. 1954), 270 S.W. 2d 58.

33.—*Housing Authority of Dallas v. Higginbotham*, 135 Texas 158, 143 S.W. 2d 79, where the Authority was described as a public-body, corporate and politic, exercising public and essentially governmental functions.

34.—Article 5890b, Section 2, Vernon's Ann. Texas Civ. Stat.

35.—*Texas National Guard Armory Board v. McCraw*, 132 Texas 613, 126 S.W. 2d 627; *Texas Turnpike Authority v. Shepperd*, 154 Texas 357, 279 S.W. 2d 302.

case, the distinction was made between bodies politic created under the Conservation Amendment and those which were not. As to the latter, this Court said:

"Nevertheless, no provision of the Constitution prohibits the Legislature from creating a governmental agency and body politic as provided in the [Turnpike] Act under consideration * * * ."[36]

The point is therefore overruled.

### V. *May a standard building within a slum area be taken for the project?*

**7** Appellant Johnson takes the position that, in any event his property may not be taken because the structure located upon his property is standard and meets the minimum requirements of the City's building code.

The answer to the contention, according to the uniform holdings of the highest courts of other states and of the Supreme Court of the United States, is that in condemning property to eliminate a slum, the act requires the city to deal with an area, not with separate individual holdings. One of the major tests of the existence of a slum is the substantial preponderance of unsafe and unsanitary structures in the area. The Legislature has determined that the feasible method of accomplishing slum clearance is by clearing an area, and we cannot say that such a determination is manifestly unreasonable.[37]

The extensive annotation in the American Law Reports, reviewing the many cases on this point, states:

"One point which does appear to be firmly established * * * is that under the statutory 'area concept,' whereby whole areas are selected for redevelopment, the statute will not be invalidated, nor will the particular projects be held illegal, because

36.—*Ibid.*, at page 304 of 279 S.W. 2d.

37.—*Randolph v. Willmington Housing Authority* (Del. Sup. 1958), 139 A. 2d 476 at 484; *Gohld Realty Co. v. City of Hartford* 1954, 141 Conn. 135, 104 A. 2d 365 at 371; *In re Jeffries Homes Housing Project*, 1943, 306 Mich. 638, 11 N.W. 2d 272; *Herzinger v. Baltimore*, 1953, 203 Md. 49, 98 A. 2d 87 at 94; *Bolsano v. Providence Agency*, 1956, 84 R.I. 323, 124 A. 2d 238; *State v. Rich*, 1953, 159 O. St. 13, 110 N.E. 2d 778 at 789; *Hunter v. Norfolk Redevelopment & Housing Authority*, 1953, 195 Va. 326, 78 S.E. 2d 893 at 901; *Velishka v. City of Nashua*, 1954, 99 N.H. 161, 106 A. 2d 571 at 575, 44 A.L.R. 2d 1406; *Berman v. Parker*, 348 U.S. 26 at 34 1954, 75 Sup. Ct. 98 at page 103, 99 L. Ed. 27.

some properties within the 'area' are by no means substandard or blighted."[38]

The principle was recognized by this Court in the *Dallas Housing Authority* case where it was said:

"When the use is public, the necessity or expediency of appropriating any particular property is not a subject of judicial cognizance."[39]

The Act, therefore, as against the specific objections here made, is upheld.

## VI.   *Trial de Novo*

Section 10 of the Act gives the cities "the right to acquire by condemnation any interest in any real property * * * which it may deem necessary for or in connection with any urban renewal project * * *." The cities are authorized to exercise the general power of eminent domain found in Articles 3264 to 3271 of the Revised Civil Statutes of Texas, 1925, as amended.

Section 17 of the Urban Renewal Act provides that in any suit brought to review or suspend any order or other act of the City or other agency, the trial shall be de novo as that term is understood in an appeal from the Justice to the County Court. It further provides that no presumption of validity or reasonableness shall be indulged in favor of the order, and that evidence shall not be heard as to its validity or reasonableness. The section concludes with the directive that the trial shall be "entirely free of the so-called 'substantial evidence rule.' "

The appellant Johnson contends that the City and its agency erroneously designated the area as a slum area, and that he is entitled to have the court decide that question anew and independently. He does not allege that the City acted arbitrarily, capriciously, fraudulently, unreasonably, or illegally.

The Texas Constitution in Section 1 of Art. 2 divides the functions of government "into three distinct departments, each of which shall be confided to a separate body of magistracy, to

---

38.—Annotation: *Urban Renewal Laws*, 44 A.L.R. 2d 1414 at 1420; see also Rhyne, *Municipal Law*, at page 523; and comment, 1955, 68 Harvard Law Review 1422 at 1431.

39.—*Housing Authority of Dallas v. Higginbotham*, 135 Texas 158, 143 S.W. 2d 79 at 89.

wit: Those which are Legislative to one; those which are Executive to another; and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others * * *."

The City contends that the power to designate particular areas as slum areas for redevelopment has properly been delegated by the Legislature to it; that, pursuant to legislative mandate, an election has been held in the city, that the people have voted that there does exist in the City one or more slum areas; and that therefore it is proper for the City Council, under the Act, to designate the area or areas to fix their boundaries and provide for their redevelopment. It asserts that the proper scope of judicial review is for the courts to determine whether the City has properly exercised its power and whether or not it has acted capriciously, arbitrarily, fraudulently, or illegally. It and many able amici curiae briefs contend that the designation of the area to be cleared and redeveloped is a legislative function which the courts may review to ascertain whether the power has been properly exercised. They conclude that for the courts to sit originally to determine the existence of a slum area to be redeveloped would violate the doctrine of separation of powers; i.e., that the courts would be exercising a legislative function.

The precise question before us has not been passed upon by this or any other Texas appellate court. The proper scope of judicial review in urban renewal cases has ben passed upon by the Supreme Court of the United States[40] and by the highest courts of Massachusetts,[41] Pennsylvania,[42] Connecticut,[43] Rhode Island,[44] Missouri,[45] and New York.[46] It has been the uniform

40.—"* * * when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive * * *. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one * * *. It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of the particular project. Once the question of the public purpose has been decided, the amount and character of the land to be taken for the project and the need for a particular tract * * * rests in the discretion of the legislative branch." *Berman v. Parker*, 348 U.S. 26, 75 Sup. Ct. 98, 102 L. Ed. 27, 1954.

41.—"* * * There are, undoubtedly, instances where men of training and experience in special subjects related to construction, sanitation, fire prevention, zoning, public health, social service and other subjects might honestly differ in determining whether a certain district was a slum area. If the question is a debatable one, we have no right to substitute our judgment for that of the defendants (the City and its agency) * * *. The various allegations, in substance and effect * * * are all matters of a legislative nature and are not open to judicial inquiry or review." *Stockus v. Boston Housing Authority* (1939), 304 Mass. 507, 24 N.E. 2d 333.

42.—"Plaintiff asserts that the mere fact that the City Planning Commission has certified the tract as a blighted area does not conclusively establish that the

holding of these courts that the designation of the area to be taken for the renewal project is a legislative function, political in nature, and that the function of the court is limited to ascertaining whether or not the function has been exercised in a legal manner and that there has been no fraudulent, arbitrary or capricious action.

But in none of these jurisdictions has the legislative body delegated the function of designating the area to be dealt with to an agency with the limitation attached that whatever the agency decides, the courts shall redetermine the correctness of the decision. In none of these jurisdictions has the legislature or the Congress provided for a trial de novo.

8   We think the particular question presented to the trial court in this case is a legislative one, political in nature, and involves questions of public policy; and for that reason Section 17 is unconstitutional as applied to these facts. It is not necessary, however, for us to declare Section 17 unconstitutional in its entirety or as it might apply to other facts or questions. Those decisions will have to be made as they arise. It is, therefore, unnecessary in this case for us to go as far as the holdings of the Supreme Court of the United States and of the courts of the states above mentioned which appear to deny the right of trial de novo in all eminent domain cases.

Our reasons for the above holding follow.

By the provisions of Section 17, the Legislature has provided for a trial anew in court of suits attacking "rules, orders, decisions, or other acts of the City Council, or other agency" made in the course of carrying out urban renewal projects.[47] Before a City Council can embark upon an area project of renewal it must find that, as it exists, the area is a "Slum Area" or a

---

47.—This provision for trial de novo is not subject to the vice which was found in *Southern Canal Co. v. State Board of Water Engineers*, 159 Texas 227, 318 S.W. 2d 619 (1958).

---

redevelopment of this particular land is in fact for a public purpose. The answer to this contention is that, in the absence of any indication that the Commission did not act in good faith or was wholly arbitrary in certifying the area designated by it as blighted, its certification to that effect is not subject to judicial review." *Schenck v. City of Pittsburgh*, 364 Pa. 31, 70 A. 2d 612 at 614 (1950).

43.—*Gohld Realty Co. v. City of Hartford* (1954), 141 Conn. 135, 104 A. 2d 365.

44.—*Balsamo v. Providence Redevelopment Agency* (1956), 84 R.I. 323, 124 A. 2d 238.

45.—*Bowman v. Kansas City* (1950), 361 Mo. 14, 233 S.W. 2d 26.

46.—*Kaskel v. Impellitteri*, 306 N.Y. 73, 115 N.E. 2d 659 (1953).

"Blighted Area." That finding or conclusion must be based upon findings and decisions made under and as required by Section 4(h) and 4(i) of Article 12691-3. An analysis of those sections will better disclose their provisions than would a quotation of them.

In Section 4(h), a "Slum Area" is defined as an area

(1) "in which there is a predominance of either residential or nonresidential buildings or improvements which are in a state of dilapidation, deterioration, or obsolescence due to their age, or for other reasons;" or

(2) "in which inadequate provisions have been made for open spaces and which is thus conducive to high population densities and overcrowding of population;" or

(3) "which is detrimental to the public health, safety, morals or welfare of the city," because the conditions described in (1) and (2), or a combination thereof, which are found to exist will

(a) "endanger life or property by fire or by other causes," or

(b) "is conducive to the ill-health of the inhabitants of the area or to the transmission of disease, and to the incidence of abnormally high rates of infant mortality," or

(c) "is conducive to abnormally high rates of crime and juvenile delinquency."

In Section 4(i), a "Blighted Area" is defined as an area which is "a menace, in its present condition and use, to the public health, safety morals or public welfare of the city" because it contains:

(1) "slum deteriorated or deteriorating residential or non-residential buildings, structures, or improvements;" or

(2) a "predominance therein of defective or inadequate streets or defective or inadequate street layout or accssibility;" or

(3) "insanitary, unhealthful or other hazardous conditions which endanger the public health, safety, morals or welfare of the inhabitants thereof and of the city;" or

(4) "a preponderance therein of the deterioration of site or other improvements;" or

(5) "conditions which endanger life, or property by fire or from other causes;" or

(6) "any combination" of the "causes, factors, or conditions," enumerated in (1), (2), (3), (4), and (5) which

(a) "results in a condition in that area which substantially retards or arrests the provisions of a sound and healthful housing environment," or

(b) "results in and constitutes an economic or social liability to the city."

Now whatever may be the nature of a decision that a particular area is a slum area because of the existence therein of conditions set out above under (1) and (2) of the definition of "Slum Area," it is quite clear that a decision that it is a slum area under (3) of the definition is a decision of a question of pure public policy. It is a decision that the conditions in the area, for any one or all of the reasons enumerated, make the area one "which is detrimental to the public health, safety, morals or welfare of the city." That is the basis of the ultimate decision made by the City Council. The conditions which are found to exist are merely evidentiary matters supporting the "decision" upon which the conclusion is reached that the area is a slum area. Just so. also, the conclusion or decision that a given area is a "Blighted Area" within the definition thereof must be based upon a finding by a City Council that because of the existence of some one or all of the conditions enumerated in (1), (2), (3), (4), (5), (6) (a) and (6) (b) above, the area is "a menace, in its present condition and use, to the public health, safety, morals or public welfare of the city."

9 Both the Board of Commissioners of the Urban Renewal Agency of the City of Lubbock and the City Commission of the City of Lubbock passed resolutions concluding or deciding that the project area involved in this case was a "slum area." Each based its decision or conclusion, at least in part, upon an ultimate finding that the existence of statutory conditions in the area rendered it "an area which is detrimental to the public health, safety, morals or welfare of the city." Both governing bodies also made ultimate findings that the area contained other blighting characteristics "which constitute a social and economic lia-

bility menacing the public health and safety of the community." It thus clearly appears that the question decided by the governing bodies of the Urban Renewal Agency and the City of Lubbock which appellants seek to have tried anew in court involves a determination of public policy. In so far as Section 17 purports to confer that power on the courts it is unconstitutional.

**10** The authority to decide whether the continued existence of particular conditions in an area is detrimental to the public health, safety, morals or welfare of the people who inhabit it, or the community surrounding it, so as to justify the exercise of the power of eminent domain, is a legislative prerogative which may be exercised only by the Legislature itself or on its behalf by an agency to which it has delegated it. *Hodges v. Public Service Commission,* 110 W. Va. 649, 159 S.E. 834. If the Legislature itself had decided that the continued existence of certain conditions in our cities was detrimental to the public health, safety, morals and welfare, the powers of the judicial branch of the government could be invoked to overturn the decision only on the ground that it was arbitrary, capricious, unreasonable, or that it deprived the complaining party of his property without due process of law. The same limitation exists on the right to invoke the powers of the judiciary to overturn a similar decision made for the Legislature, at its special behest, by one of its agencies.

A decision or conclusion by the agency that a particular area is a "Slum Area" or "Blighted Area" is thus made to rest upon a finding involving legislative discretion. A de novo judicial review of such a decision would clearly involve the exercise by the courts of nonjudicial powers.

**11** Since, as applied to the particular question before us, Section 17 is unconstitutional, there remains in Article 1269l-3 no valid provision whatever for an appeal from the decision of the City Council. In that respect this statute differs from the statute under review in *Southern Canal Co. v. Board of Water Engineers, supra,* Note 47. The City does not contend that the unconstitutionality of Section 17 leaves appellants without a right of judicial review. This Court has held that, under the circumstances, that right will be implied. *Board of Insurance Commissioners v. Title Ass'n of Texas,* 153 Texas 574, 272 S.W. 2d. 95.[48]

**12** Where the right of court review is implied and the judicial

---

[48].—See also *City of Amarillo v. Hancock,* 150 Texas 231, 239 S.W. 2d 788; *English Freight Co. v. Knox,* Texas Civ. App., (1944), 180 S.W. 2d 633, writ refused.

question relates to the reasonableness of the order, that issue is determined by testing the evidence in accordance with the rule stated in *Board of Water Engineers v. Colorado River Municipal Water District,* 152 Texas 77, 254 S.W. 2d 369: "If an order is reasonably supported by substantial evidence it is reasonable; otherwise it is unreasonable." *White v. Bolner,* Texas Civ. App., 223 S.W. 2d 686 (wr. ref.); *Southern Canal Co. v. State Board of Water Engineers,* 159 Texas 227, 318 S.W. 2d 619.

The trial court in this case, sitting without a jury, determined that the actions of the City and its agency were neither capricious nor arbitrary, but were reasonable and just.

The judgment of the trial court is affirmed.

Opinion delivered July 15, 1959.