No. 47,240

Duane E. West and Orvileta M. West, husband and wife; Emma Leah LaGesse; Edward Tomchak and Frances Tomchak, husband and wife; Gladys Paasch and Navrat's of Garden City, Inc., a Kansas Corporation, *Appellees,* v. The City Commission of the City of Garden City, Kansas and James Steward, Charles Collins, D. C. Garcia, D. Kenneth Minter, Jr. and Cecil Baker, the City Commissioners of said City; The Urban Renewal Agency of Garden City, Kansas and Homer Campbell, Lowell Craig, Robert Garnand, A. C. Gottschalk and A. E. Rudd, the Board of Commissioners of the Urban Renewal Agency of Garden City, Kansas; and Marsha Adams, executive director of the Urban Renewal Agency of Garden City, Kansas, *Appellants.*

(520 P. 2d 1290)

Opinion filed April 6, 1974.

*Ward E. Loyd,* of Calihan, Green, Calihan & Loyd, of Garden City, argued the cause, and *Clyde P. Daniel,* of Daniel & Bolin, of Garden City, was with him on the brief for the appellants.

*Selby S. Soward,* of Zuspann, Soward, Whalen & Burr, of Goodland, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

Owsley, J.: Defendants appeal from the trial court's order permanently enjoining condemnation of plaintiffs' property to implement Phase II, Part 3, of the Garden City, Kansas, Neighborhood Development Program. Defendants specifically appeal from that portion of the order which declares the city commission's finding of slum and blight unreasonable, capricious and arbitrary.

In 1968, by Resolution 800, the city commission of Garden City, pursuant to requirements of K. S. A. 17-4746 and to exercise statutory urban renewal powers, found existent areas of slum and blight as those terms are defined by K. S. A. 17-4760 *(h)* and *(i)*, and

further found rehabilitation of those areas necessary to the public welfare. By other resolutions, the city commission created the defendant Urban Renewal Agency and appointed members of the defendant Urban Renewal Commission.

On May 5, 1969, by Resolution 841, the city commissioners designated the entire downtown area of Garden City as within the boundaries of the urban renewal area. It was published May 7 and May 27, 1969, and has not been altered.

Plans for a one-year Neighborhood Development Program were drawn by the Urban Renewal Agency and approved by the Urban Renewal Commission and the Human Relations Commission acting as the required Citizens' Advisory Committee. The plans were approved by the Garden City-Finney County Metropolitan Area Planning Commission as conforming with the general plan for long-range development of the city and county. The Neighborhood Development Program procedure was chosen by defendants to enable them to plan and fund projects on a year-to-year basis rather than obligate the city to plan and carry out a single urban renewal program over several years.

Public hearing on Phase I of the plan was announced and was held on March 28, 1969, with no protests submitted. The commission adopted Phase I and submitted it to the Department of Housing and Urban Development (HUD). The Phase I project was approved and funded effective June 30, 1971, and the Urban Renewal Agency expended $333,949.89 for acquisition and $33,278.08 for relocation of tenants in the construction of a downtown parking facility.

Phase II, comprised of three projects within the same boundaries, was submitted and approved according to law by the same boards, committees and commissions. A public hearing was held on March 22, 1972. At that hearing some of the plaintiffs protested Part 3 of Phase II because it would require condemnation and clearing of their property in preparation of a large site for a major downtown commercial facility. Notwithstanding the objections of these property owners, and in accordance with K. S. A. 17-4746, the city commissioners again found areas of slum and blight extant as those terms are defined in K. S. A. 17-4760 (*h*) and (*i*), and rehabilitation conservation or redevelopment of such areas was in the interest of the public health, safety, morals and welfare of the residents of Garden City. These findings were formalized in Resolution 910 passed on March 22, 1972.

Plaintiffs, as representatives of a class comprised of owners and tenants of property in the urban renewal areas, filed their petition for injunction on June 20, 1972, alleging the area was not and is not a slum or blighted area; the city commission's action in so determining was unlawful, unreasonable, arbitrary and capricious; and praying actions arising out of such determination be permanently enjoined. They further alleged the defendant Urban Renewal Commission failed to comply with provisions of K. S. A. 17-4758 requiring public disclosure of commissioners' direct or indirect interest in property within the urban renewal projects, and violation of plaintiffs' rights under the Fifth and Fourteenth Amendments.

Defendants' motions for summary judgment and for more definite statements were overruled. They then filed answers in the form of general denials and asserted the plaintiffs were guilty of laches.

Based upon stipulations of the parties, exhibits, physical inspection of the area involved, and the pleadings, the trial court stated the issues to be the following:

"Are or were the official actions by the City Commissioners and the Commissioners of the Garden City Urban Renewal Agency, lawful and reasonable under the circumstances; or were such actions void because they were either unlawful or fraudulent, or so unreasonable, capricious or arbitrary as to constitute constructive fraud or abuse of discretion. A further issue is whether any such commissioners were disqualified to act because of conflict of interest, and the effect of any disqualification, if any. The Court considers that laches are a legal matter under all of the circumstances and it does remain one of the issues of the case."

The record reflects the trial judge toured the area with consent of counsel to orient himself to the evidence and exhibits. The court later announced it would consider such "windshield view" along with all the evidence in the case.

Following a six-day trial, the court found plaintiffs were not guilty of laches because they had no notice their property was to be taken until the commencement of Phase II, Part 3; and their action did not impair city contracts since contracts to implement that portion of the project had been let after the commencement of this action.

The court further found defendants followed proper statutory procedures with reference to Phase II, Part 3, and that the same was not unlawful. We take that finding to be dispositive of any

possible violation of K. S. A. 17-4758 requiring disclosure of commissioners' indirect interest in property condemned.

Additionally, the court found the city commission's determination of slum and blight was based upon "opinion without factual foundation," and was unreasonable, capricious and arbitrary to the extent it constituted constructive fraud on the owners of property affected. Despite the breadth of its findings that no slum or blight existed in Garden City on March 22, 1972, or any other time, the court found it necessary to void only Phase II, Part 3, of the urban renewal project. Pursuant to these findings, the court ordered defendants permanently enjoined from taking plaintiffs' property for urban renewal purposes.

Defendants appeal from that order and allege among other points on appeal that the district court erred in substituting its judgment for that of the city commission. The rules limiting the scope of judicial review of municipal urban renewal activities are set out in *Urban Renewal Agency v. Decker,* 197 Kan. 157, 415 P. 2d 373, as follows:

"The legislature has the inherent power of eminent domain limited only by constitutional restrictions. Such power may be delegated by the legislature to any public authority to be exercised as directed. So the power of eminent domain as to urban renewal has been given by the legislature to the municipality to determine that slum or blighted areas exist in such municipality and the rehabilitation, conservation, or redevelopment of such areas is necessary in the interest of public health, safety, morals or welfare of the residents of the municipality. The municipality has the exclusive right within its statutory authority in the first instance to determine what lots, parcels or tracts of land are to be taken, after public hearing provided by statute, and then file a petition to exercise the right of eminent domain. The presumption is that public agencies and officers vested with discretionary administrative powers will perform their duties in a proper manner and exercise their powers in good faith. . . ." (p. 162.)

Plaintiffs' evidence to prove the city commission's action in finding slum and blight to be arbitrary, capricious and unreasonable consisted of testimony of owners of property in the urban renewal area. They uniformly testified the area was not, in their opinion, one of slum or blight as they understood those words. These opinions were objected to by defendants as being without foundation since the witnesses were variously employed and occupied respectively as attorney, bookstore owner, accountant, businessman, real estate broker, insurance agent, and county assessor, and were not experts in engineering, city planning, architecture or related

fields. Their opinions were based, not on the statutory definition of slum and blight, but upon the lay witness' own concept of slum and blight; *i. e.*, that it was a condition prevalent in and peculiar to large urban areas and was characterized by crowded, multi-family dwellings of the ghettos. The effect of much of plaintiffs' evidence is to question the standards established by the legislature for determining slum and blight, and that is not at issue in this case.

Defendants presented as evidence of the reasonableness of their determination of slum and blight, testimony of consultants in city planning and engineering who had made the surveys and classifications of the property on which the urban renewal project and the commission's findings of slum and blight were based.

Frank E. Smith, vice-president and general manager of Oblinger and Smith Corporation, testified they had offices in Kansas City, Denver, Wichita, and Dallas, and were consultants in commercial and city planning, urban renewal, and land and subdivision planning. Urban renewal projects constituted approximately one-third of their work. Since 1968 this firm had worked for the City of Garden City, preparing maps, a four-volume comprehensive plan, and two neighborhood development program applications for the city. Smith had supervised the preparation of the Phase I application for urban renewal funds. In connection therewith, several exhibits were prepared, such as maps and statistical studies which he identified in court. When asked if he knew what information the city commission might or might not have relied on in making a conclusion, he replied: "They relied on our consultation as well as the detailed facts and figures that we produced for them." These reports included deficiencies which the Kansas statutes define as characteristic of slum and blight. Smith testified:

"The following deficiencies were found to exist in the project:

"1. Overcrowding in both residential and non-residential uses with buildings or on sub-standard size lots without provisions for surface and/or parking.

"2. The area is dominated by obsolete residential, commercial and industrial buildings, which have a blighting influence on their surrounding.

"3. There is no cohesive pattern of uses. There exists a mixing of incompatible land uses to the detriment of all uses in the project area.

"4. There exists an excessive amount of land in public rights-of-way. There is traffic congestion and conflicts between pedestrian and auto.

"5. Public utilities and community facilities are inadequate, undersized, deteriorated, or totally lacking.

"6. There is a general disorganization of the pattern of uses and the flow of traffic. The entire project area exhibits a general deterioration and a sense of blight."

Smith testified the commission had knowledge of the statutory definition of slum and blight since it was discussed with the city commission at the very first meeting with Oblinger and Smith.

Lowell E. Richardson, employed by the Oblinger and Smith Corporation as planner, testified he was responsible for preparation of the Phase II application; that he was connected with urban renewal projects in Garden City for over fifteen months; that he was in Garden City for twelve or fifteen meetings with defendant commissioners; that such meetings usually lasted a day and other employees were there for longer periods of time developing and updating information. He testified he was familiar with the Kansas statutes and in his opinion the area was blighted. In reaching that conclusion he considered the existence of mixed land uses, inadequate street layout, the need for storm drainage, lack of utilities, and the building conditions. He testified that in working with their urban renewal projects, he had a number of conferences with city officials and commisisoners, the city manager or his assistant, and that on two occasions he met with the city planning commission and the city engineer. Richardson testified he attended and participated in the public hearing on March 22, 1972; he expressed his opinion that the area was one of slum and blight and in need of development, and he presented factual data to the commissioners to support his finding of slum and blight. In the witness' opinion, which was before the city commissioners on March 22, 1972, the greatest threat to Garden City's downtown business district was the predominance of functionally obsolete buildings unsuited for current merchandising methods; that unless a modern retail facility was established in the downtown area to provide the retail area estimated for future needs, such large facility would locate on the outskirts of town where large tracts of land were readily available. That would lead to rapid decay of the downtown area and further loss of value to the surrounding property. Locating such a facility downtown, he testified, would necessitate clearing and preparation of a large site, which was the purpose of Phase II, Part 3.

Other defense witnesses included two defendant commissioners who testified that in making their determination of slum and blight they took into account their own knowledge of conditions, the exhibits prepared by Oblinger and Smith, and the expert opinion of these consultants.

The city manager testified the city commissioners were fully informed of local building codes, ordinances, the studies and data prepared by Oblinger and Smith, and the opinions of the consultants when they made their factual determination of slum and blight. He shared their opinion that slum and blight, as statutorily defined, existed in Garden City.

Witnesses from the Kansas City area office of HUD, who review and direct urban renewal grants to Kansas and other midwest communities, testified Garden City met all the eligibility standards for urban renewal funds, including the factual existence of slum and blight as defined by Kansas statute. They had personally toured the area to verify the accuracy of the Oblinger and Smith data in the application.

Judicial review of the reasonableness of a legislative determination of slum and blight has frequently been urged by opponents of particular urban renewal projects. It has uniformly been held that a court cannot substitute its opinion for that of the legislature and its administrative agency, the local city governing body. To allow the court to originally determine the existence of a slum or blight condition by trial de novo would violate the doctrine of separation of powers and usurp legislative power. (*Davis v. City of Lubbock,* 160 Tex. 38, 326 S. W. 2d 699; *Berman v. Parker,* 348 U. S. 26, 99 L. Ed. 2d 27, 75 S. Ct. 98; *Stockus v. Boston Housing Authority,* 304 Mass. 507, 24 N. E. 2d 333, 336; *Gohld Realty Co. v. Hartford,* 141 Conn. 135, 104 A. 2d 365; *Balsamo v. Prov. Redevelopment Agency,* 84 R. I. 323, 124 A. 2d 238; *Bowman v. City of Kansas City,* 361 Mo. 14, 233 S. W. 2d 26; *Kaskel v. Impellitteri,* 306 N. Y. 73, 115 N. E. 2d 659; *Apostle v. Seattle,* 77 Wash. 2d 59, 459 P. 2d 792.)

Our review of the record leads us to conclude proper study and consideration of the issue of slum and blight preceded the commission's approval of Resolution 910. Private citizens disagreed with the commission's determination of slum and blight, but their opinions were not based upon any statutorily recognized principles, and they were not experts whose opinions were relevant to rebut the commissioners' determination of a question of fact. Those opinions cannot be said as a matter of law to be decisive of the factual issue. The expert testimony of defendants' witnesses supported the city commissioners' finding of slum and blight as statutorily defined. Giving proper weight to the testimony supporting

the judgment of the trial court, we can only concede the question of slum and blight was at most debatable. Under those circumstances, the principle of separation of legislative and judicial powers compels us to support the decision of the city commission since they are charged by state law with that responsibility. The basis for our reversal of the trial court's decision is aptly expressed in *Apostle,* supra:

"Had any member of this court been in Judge Hodson's place, his reaction might have been the same, but, fortunately or unfortunately, the judiciary does not have the responsibility of passing on the credibility of the witnesses, or of weighing the evidence with reference to blight in such a proceeding. . . . [T]he legislature has made the local governing body (the city council in this instance) the tribunal which makes the factual determination of blight. The province of the court is only to determine whether the factual determination of blight is supported by sufficient evidence to prevent the city council's determinations from being arbitrary and capricious. The trial court may not overrule the city council's determination of blight merely because it believes that the area is not blighted. . . ." (p. 63.)

From our review of the record we conclude the trial court erred in finding the city commission of Garden City acted arbitrarily, capriciously and unreasonably in determining the factual issue of slum and blight, and the injunction based upon that erroneous finding must be dissolved.

Reversed.

FROMME, J., not participating.