**GILLHAM v. CITY OF DALLAS.**

No. 13893.

Court of Civil Appeals of Texas. Dallas.

Jan. 9, 1948.

Rehearing Denied Feb. 6, 1948.

J. Manuel Hoppenstein, olf Dallas, for appellant.

H. P. Kucera, City Atty., and H. L. Nichols, Asst. City Atty., both of Dallas, for appellee.

BOND, Chief Justice.

Appellant, as plaintiff, instituted this suit in the capacity of a taxpayer, for himself and for other taxpaying citizens similarly situated, and for an injunction restraining the City of Dallas from expending illegally and unlawfully bond funds contrary to a purpose for which the bonds were voted and for a purpose not authorized by the charter of said City or the Constitution and laws of the State of Texas.

The funds involved were obtained by the sale of bonds authorized pursuant to an election held by the City "For the purpose of obtaining money for a public market, and

acquisition of land for buildings, sites therefor, and the erection of necessary buildings, appurtenances, and equipment."

The case was tried to the court without intervention of a jury, upon agreed stipulation of facts supplemented, over objection of appellant, by testimony of two witnesses. The court entered judgment denying appellant's prayer for injunction, and against plea of res judicata interposed by the appellee. The appellant timely perfected his appeal, assigning error to the action of the court in denying the injunction; appellee countered with cross-assignment in overruling its plea of res judicata.

It is conceded by appellant that the City of Dallas has the right to spend the bond funds for the purpose of purchasing sites, erecting buildings, and providing the buildings with necessary equipment for the conduct of a "public market," but differs with the City as to whether or not the use to which the City is placing the bond funds, in the erection and construction of warehouses for the use of wholesalers and jobbers and agents of wholesalers and jobbers conducting the business of receiving, storing, shipping, handling, selling and distributing agricultural groceries and market products, including generally all foods and beverages, and from which premises the general public is excluded, is an authorized use of the bond funds. It is the contention of appellant that the use to which the funds are being put by the City is not for a public market, but on the contrary is the providing of a private market for the use of private individuals, wholly disconnected from a public market use.

The stipulation of facts accompanying the record in this appeal recites, material here, that the plaintiff is a representative citizen and qualified voter and taxpayer of the City of Dallas, Dallas County, Texas, and owns property within said City subject to taxation, and the property is on the tax rolls of the City; and in all respects plaintiff is authorized to maintain this suit for himself and other citizens and taxpayers of the City of Dallas similarly situated; that a levy of a tax for the purpose of paying off the bonds from which the funds in suit were derived, would constitute a charge and lien against plaintiff's property and the property of other taxpaying citizens similarly situated; that the City of Dallas is a municipal corporation organized under a special Act of the Legislature, Senate Bill No. 316, approved April 13, 1907, Sp.Acts 1907, c. 71, and is operating as a Home Rule City under the Home Rule Amendment to the State Constitution, Art. 11, sec. 5, Vernon's Ann.St., governing cities of more than 5,000 inhabitants, and is operating under a charter legally adopted by the qualified voters of said City. That on June 28, 1941, there was duly submitted to the qualified voters of the City of Dallas a proposition for the issuance of $500,000 in bonds to raise funds for the building of a public market, the acquisition of land for building sites, and erection of necessary buildings and appurtenances and equipment; and on December 8, 1945, another bond issue of $1,500,000 was duly submitted for an additional same purpose as in the first election. These propositions were both adopted by the qualified voters and in accordance therewith the City issued and sold $1,020,000 of the bonds; and to meet the interest and principal maturities annually, the City levies and collects ad valorem taxes on all taxable property in the City and will continue to levy such taxes until the outstanding bonds have matured and been paid off.

It is further stipulated that it is the intention of the City, acting through its governing authorities, to use and will use a portion of the funds derived from said bond issues, to the extent of $451,785, for the purpose of building and equipping a building or buildings to be known as the "Wholesale Carlot Produce Building" to be rented and used for cold storage rooms, warehouses and refrigerated units for the purpose of receiving, shipping, handling, selling and distributing of produce, agricultural products, fresh fruits, vegetables and the like; and be equipped with refrigerated rooms, elevators, offices, rest rooms, together with loading and unloading docks with access to railroad tracks for receiving such products; that the City intends to lease space in the buildings to private persons of its choice, to engage in the wholesale business of handling fresh fruits, vegetables, agricultural products and other kindred items intended for food. That two of the buildings have

been completed and the City has let contract for sixteen other units which are in process of construction, erected and equipped at a total contract price of $451,-875, to be paid out of the sale of the aforesaid bonds; and has already entered into two lease contracts which reflect the purpose of the City in the building enterprise and the expenditure of the involved funds,—one with Wyatt Food Stores and another with Cabell's, Inc., leasing to Wyatt four of said units and to Cabell's three of said units, to be occupied by them when completed, for the purpose of receiving, shipping, storing, handling, selling and the distribution of their agricultural grocery and market products, including generally all foods and beverages. The lease contracts run for a term of ten years, at a rental for each unit of $216.18 per month, and $279.93 per month for the use of banana rooms and refrigerator rooms, the lessees to pay all charges for water, gas, lights, and power furnished the unit or units leased, and all other charges which might accrue with respect to the use and occupancy thereof, except taxes, assessments or other public charges which may be imposed upon the leased premises, improvements, lands and buildings, by public authority; and the lessees are authorized to install such facilities as they may deem necessary or convenient for the conduct of their business carried on in said premises, the City reserving the right at reasonable times to enter into and upon the premises to examine and supervise the condition thereof and business therein; and, further, the lessees are authorized to sublet the leased premises in whole or in part, but any such subletting shall only be to a dealer conducting a wholesale produce business of receiving, storing, shipping, handling, selling and distributing agricultural grocery and market products, including generally all foods and beverages; and the lessees and sublessees are obligated to conduct their business so as to conform to all regulations and ordinances of the City of Dallas and the provisions of the State law applicable to the business conducted therein. The aforesaid leases are made subject to the provisions of the charter and ordinances of the City of Dallas and are terminable at the election of the lessor, should it be found that the public interest, safety, health or comfort should require the leased premises to be devoted to some public use, and provides for renewals at expiration of the present leases for an additional period of five years, at an adjustable amount of monthly rentals.

The stipulation of facts further relates that the City of Dallas has heretofore built and has in operation two open sheds, each of which covers one regular City block, for the purpose of providing space and shelter for truckers, farmers and producers who bring their produce to the Dallas Municipal Produce Market to sell directly to consumers, retailers and jobbers; but such facilities are not equipped with refrigeration, preservation or conservation for the farmers' products brought to the Municipal Market. Under the projected plan, the City of Dallas intends to erect altogether, 36 units for such storage rooms and warehouses which will be suitable for the installation of refrigeration and all other facilities designed for the purpose of receiving, storing, conserving, selling and distributing such products as fresh fruits, vegetables and other agricultural products intended for food, as outlined in the aforesaid lease contracts.

The stipulation of facts further relates that the City of Dallas has in effect Ordinance No. 3665, providing for the establishment and regulation of a Municipal Produce Market to enable farmers and produce dealers to vend their products without the using of streets of the City and for the convenience of the public, defining the use of such market places and terms of occupancy by such produce farmers and dealers. To that end, the City created the office of Supervisor of Weights, Measures and Markets, defining the duties of such supervisor in reference to the general regulation and supervision of the Municipal Market.

The City of Dallas being a municipal corporation operating under the provisions of the Home Rule Amendment to the State Constitution, Art. 11, sec. 5; the powers of a corporation are enlarged to embrace all powers included in its charter and not "inconsistent with the Constitution of the State, or of the general laws enacted by the

Legislature of this State." Under the constitutional power and under Art. 1176, R.C. S. (1925) the City is accorded the right to exercise all powers incident to the enjoyment of local self-government; and under Art. 1015 the powers are enumerated by name, of which sec. 31 specifically empowers such cities "To establish or erect, or cause to be established or erected, markets and market houses; designate, control and regulate market places and privileges; inspect and determine the mode of inspecting meat, fish, vegetables and all produce and every article and thing therein brought for sale"; and section 43 provides: "Improvements.—To appropriate so much of the revenues of the city emanating from whatever source, for the purpose of retiring and discharging the accrued indebtedness of the city, and for the purpose of improving the public markets and streets, erecting and conducting city hospitals, city hall, waterworks, and so forth, as they may from time to time deem expedient; and in furtherance of these objects, to borrow money upon the credit of the city"; and section 291 of the charter of the City enumerates various purposes for which the City may issue bonds, and then provides: " * * * the City of Dallas shall have authority to issue bonds, when authorized by the taxpaying voters, for any purpose for which a City may issue bonds under the Constitution and laws of this State."

■■ The above legislative and charter provisions having specifically authorized the construction, operation and maintenance of municipal public markets, and to finance same through the sale of bonds for that purpose, it is within the sound discretion of the governing board of the City as to what shall compose its "public market," and determine the necessity of exercising the power. Its determination of these questions is final and may not be revised by the courts, in the absence of clear and conclusive evidence that the board's action was arbitrary and without reasons. The burden rests upon the aggrieved party to show the abuse of such discretion. The authority of the City thus granted to construct, operate and maintain a "public market" is in general language and does not prescribe of what a public market shall consist, or how it shall be conducted, leaving such for the determination of the governing body. The case of City of Denton v. Denton Home Ice Co., 119 Tex. 193, 27 S.W.2d 119, 120, 68 A.L.R. 866, illustrates the broad discretion given the governing body of a City in determining the needs of the public and the manner of use of such needs. In that case, the Commission of Appeals in holding that the City might establish and operate an ice plant, made the following statement, appreciable here: "It can hardly be said, under our modern industrial, social, economic, and domestic conditions and customs, that ice is not a thing needed and used by the public. In fact it is now so generally needed and used that it is a public necessity. Ice is now used in practically every home, office, store, manufacturing plant, and by nearly all people under all circumstances and in all walks of life. It is a necessity for the well, as well as the sick, and even the most humble laborer while at work, is usually furnished ice in his drinking water."

■ So, too, refrigeration, cold storage and proper facilities for preservation and conservation of perishable foods are so related to the necessities of health and convenience of the public generally, that it can no longer be said that such facilities are not needed for the public good, and that they are not proper connecting facilities to an improved, modern, municipal market. As said in the case of City of Tombstone v. Macia, 30 Ariz. 218, 245 P. 677, 680, 46 L. R.A. 828: "In considering what is properly a public purpose, we should not be controlled to too great an extent by decisions of courts in climates far distant from ours. Further, we should not be to too great an extent controlled by decisions which come from a remote time, and therefore may be out of tune with modern conditions. The question of what is a public purpose is a changing question, changing to suit industrial inventions and developments and to meet new social conditions."

So here, in the not too distant past, electrical refrigeration and appliances for cold storage plants, warehouse facilities for the care, conservation and preservation of food products, fruits, vegetables, eggs, meats and other kindred products, may not have been considered essentially public, or contribu-

tions to the health and convenience of the City at large. Whilst in modern times, refrigeration and cold storage facilities to meet the growing demand of producers and consumers, as well as dealers, to conserve food products in large quantities, in wholesale lots, have become things essentially necessary for the preservation and conservation of such food products and to meet the needs and uses of the people and the welfare of the general public. The contemplated buildings involved herein are unquestionably a physical and necessary part of appellee's municipal market. It is an important part, since it is to furnish refrigeration and cold storage warehouses for purposes essentially for the preservation and conservation of foods,—of which the present market sheds are wholly lacking. "It is elementary that the proceeds of bonds voted by the people must be expended for the purposes for which they were voted. It is also elementary that in instances where the law visits upon a governing body the duty to exercise its sound judgment and discretion, courts have no right to interfere so long as such body acts lawfully." Lewis et al. v. City of Fort Worth, 126 Tex. 458, 89 S.W.2d 975, 978; City of Beaumont v. Matthew Cartwright Land & Imp. Co., Tex. Civ.App., 224 S.W. 589.

■ It follows, we think, that the Board of Commissioners of the City of Dallas had the right to expend the proceeds of the bonds legally voted for the purposes of a public market, and, in the exercise of sound discretion and judgment, build and equip the buildings contemplated, in harmony with the general purposes of such market, either by the expenditure of the bond funds or by contracting with others to furnish equipment to carry out the general purposes of the enterprise under the supervision and control of the City authorities. Fresh fruits, vegetables and country products, in quantities for the needs of metropolitan cities such as Dallas, are so essential to the health and welfare of the people, that, without proper facilities for refrigeration and cold storage for carload lots, necessarily the public needs and welfare are curtailed in proportion to the lack of such space and equipment to care for such needs.

■ So long as the City authorities supervise and control the contemplated buildings and the business conducted therein, and such buildings and use thereof serve some public market purpose, as reflected in this appeal, the statutes do not exclude the erection of such buildings by the expenditure of bond funds. The validity of the contracts entered into with Wyatt and Cabell, and such as are contemplated in like terms with others, are not involved here; they are merely evidentiary of the contemplated purposes for which the buildings are to be used. The buildings are public, in that they are to serve the public in connection with the City's municipal market, not necessarily for farmers and market gardeners, but for the purposes generally belonging to the City Municipal Market. It cannot be said that the City authorities acted unreasonably and arbitrarily in deciding that cold storage facilities are properly a part of its public market. Appellant has wholly failed to meet the burden of proof evidencing the City's action as being unreasonable or arbitrary; in the absence of such showing, the trial court properly refused the injunction. Sitterle v. Victoria Cold Storage Co., Tex.Civ.App., 33 S.W.2d 546.

■ Appellant complains of the action of the trial court in overruling his objections and exceptions to the testimony of J. D. Walton as to the future plans and needs of the City for the contemplated buildings and facilities for preservation and conservation of food products, "such testimony being speculative, anticipatory, guesswork and hearsay, and mere opinions of the witness." We are of the opinion that the testimony was objectionable and appellant's exceptions should have been sustained. However, the case having been heard before the court without a jury, the judge of the court could disregard such evidence, and, in the light of the record, manifestly such testimony was disregarded. And we are of the opinion that the admission of the objectionable testimony could produce no injury; in view of our opinion on the primary issues involved in this appeal, such presents no reversible error.

We are also of the opinion that the trial court did not err in overruling appellee's plea of res judicata on the strength of the suit of City of Dallas v. Shackelford, affirmed by this court, 200 S.W.2d 869, in which Rutchik and Shackelford, as owners of the land on which the related contemplated buildings in this suit are to be erected, sought to enjoin the City from condemning said property, on the ground that the property was not sought by the City for a public purpose. We overruled appellee's counter assignment. The Shackelford suit was different from that in the present suit; the parties there were different from those in this suit. However the basic fact here was presented in the Shackelford suit that the property condemned was to be used for the construction of refrigerated warehouse facilities which did not constitute a public purpose. We think the Shackelford suit cannot prejudice rights of appellant in this suit under the principle of res judicata.

Judgment of the court below is in all things affirmed.