

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00022-CV

_____

CYNTHIA MARTIN, Appellant

V.

HOPKINS COUNTY, HOPKINS COUNTY JUDGE ROBERT NEWSOM, HOPKINS
COUNTY COMMISSIONER MICKEY BARKER, HOPKINS COUNTY COMMISSIONER
GREG ANGLIN, HOPKINS COUNTY COMMISSIONER WADE BARTLEY, AND
HOPKINS COUNTY COMMISSIONER JOE PRICE, Appellees

On Appeal from the 62nd District Court
Hopkins County, Texas
Trial Court No. CV44739

Before Morriss, C.J., Stevens and van Cleef, JJ.
Opinion by Justice Stevens

# OPINION

Cynthia Martin raised ultra vires claims against Hopkins County officials in connection with the county's agreement with a private company to build a solar power plant. The trial court found that the county's contract complied with requirements of the Texas Local Government Code and granted a summary judgment against Martin on her ultra vires claims. On appeal, Martin challenges the trial court's summary judgment. We find that the county and its officials established that there was no genuine issue of material fact and that they were entitled to judgment against Martin as a matter of law. As a result, we affirm the trial court's judgment.

## I. Factual Background

The heart of this case involves Chapter 381 of the Texas Local Government Code, which provides an avenue for counties to "promot[e] the prosperous development of business, industry, and commerce in the county." TEX. LOC. GOV'T CODE ANN. § 381.001(f). Section 381.004(b) authorizes "the commissioners court of the county [to] develop and administer a program . . . for state or local economic development" "to stimulate business and commercial activity in a county." TEX. LOC. GOV'T CODE ANN. § 381.004(b)(1) (Supp.). To effectuate this purpose, Section 381.004 provides several means that counties may employ to attract business, industry, and commerce.

Under subsection G, "[t]he commissioners court may develop and administer a program . . . for entering into a tax abatement agreement with an owner or lessee of a property interest subject to ad valorem taxation." TEX. LOC. GOV'T CODE ANN. § 381.004(g) (Supp.). Should the county seek to attract a business by using a tax abatement agreement, "[t]he execution, duration,

2

and other terms of the agreement are governed, to the extent practicable, by the provisions of Sections 312.204, 312.205, and 312.211, [of the Texas] Tax Code, as if the commissioners court were a governing body of a municipality." *Id.* Should the county forego a tax abatement incentive under subsection G, subsection H allows "[t]he commissioners court [to] develop and administer a program . . . for making loans and grants of public money." TEX. LOC. GOV'T CODE ANN. § 381.004(h) (Supp.). The central issue here is whether Hopkins County (the County) employed subsection G or subsection H to attract Hopkins Energy, LLC (the Developer), which sought to build a solar power plant while providing advertised community benefits, including local tax revenue, permanent jobs, and community support via substantial charitable contributions.

Discussions between Hopkins County and the Developer spanned several years. On November 4, 2021, the public received notice of a Monday, November 8 regular meeting scheduled for 9:00 a.m. in the County Commissioners' Courtroom, which showed that the purpose of the meeting included, among other things, consideration and approval of an agreement between the County and the Developer. On November 8, 2021, the County entered into an Amended and Restated Chapter 381 Economic Development Program and Agreement with the Developer (the Agreement).[1]

Martin sued Hopkins County and the following officials in their official capacities: County Judge Robert Newsom; and County Commissioners Mickey Barker, Greg Anglin, Wade

---

[1]Although there were prior agreements between the County and the Developer, the Agreement was the operative one at the time of the trial court's summary judgment.

3

Bartley, and Joe Price (collectively the Officials).[2] In her live pleading, Martin alleged that the Agreement offered tax abatement incentives under subsection G of Section 381.004, not loans or grants under subsection H. As a result, Martin asserted ultra vires claims against the Officials because the Agreement did not comply with provisions of the Texas Tax Code, a subsection G requirement.[3] Martin prayed for injunctive relief and declarations that the Officials "lack[ed] legal authority to take any prospective action in accordance with or pursuant to the . . . Agreement," or "to reimburse any ad valorem taxes collected from [the Developer]."

In response, the County and the Officials filed a traditional and no-evidence motion for summary judgment arguing that the Agreement with the Developer was made pursuant to subsection H, which did "not require that the agreement be governed by any other statute, including the Texas Tax Code Sections." As a result, the Officials argued that they could not be held liable for alleged ultra vires acts in Martin's petition, which were all based on Texas Tax Code violations. After a hearing, the trial court granted the traditional motion for summary judgment.

## II.     Standards of Review and Applicable Law

Based on her interpretation of the Texas Local Government Code and the Agreement, Martin argues that the trial court erred by granting summary judgment against her. "We review summary judgments de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor."

---

[2]We refer only to Martin's live pleading at the time of the summary judgment, which was her third amended petition.

[3]Martin's live pleading also alleged that the County violated the Texas Open Meetings Act, but her appeal only addresses the ultra vires claims.

4

*Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022) (quoting *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 811 (Tex. 2019)). "A party that moves for traditional summary judgment must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Id.* (citing TEX. R. CIV. P. 166a(c)).

"Once the movant produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence raising a genuine issue of material fact." *Polecat Hill, LLC v. City of Longview*, 648 S.W.3d 315, 330 (Tex. App.—Texarkana 2021, no pet.) (citing *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996)). Because the trial court did not specify the basis for its ruling here, "we must affirm a summary judgment if any of the grounds on which judgment is sought are meritorious." *Brown v. CitiMortgage, Inc.*, No. 06-14-00105-CV, 2015 WL 2437519, at *2 (Tex. App.—Texarkana May 22, 2015, no pet.) (mem. op.) (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)).

The trial court's summary judgment involved resolution of the parties' contract construction and statutory construction arguments, and we review the trial court's legal determinations on these matters de novo. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019); *Energen Res. Corp.*, 642 S.W.3d at 509 (citing *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018)).

Because "Texas has a strong public policy favoring freedom of contract," *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 403 (Tex. 2022), we first "look to the language of the parties' agreement" to construe it, *Barrow-Shaver Res. Co.*, 590 S.W.3d at 479 (citing *Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018)). "When a

5

contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *James Constr. Grp., LLC*, 650 S.W.3d at 403 (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018)). We "attempt[] to give effect to all provisions." *Id.*

Also, the language of a contract must be given "its plain, grammatical meaning unless it 'would clearly defeat the parties' intentions.'" *Barrow-Shaver Res. Co.*, 590 S.W.3d at 479 (quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). "If we determine that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous[,] and we will construe it as a matter of law." *Id.* (quoting *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). "But if the contract contains two or more reasonable interpretations, the contract is ambiguous, creating a fact issue as to the parties' intent." *Id.* (citing *El Paso Field Servs.*, 389 S.W.3d at 806).

"In construing a statute, our objective is to determine and give effect to the Legislature's intent." *Energen Res. Corp.*, 642 S.W.3d at 509 (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). "We begin by examining the plain meaning of the statute's language." *Id.* (citing *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014)). "If the statute is clear and unambiguous, we must read the language according to its common meaning 'without resort to rules of construction or extrinsic aids.'" *Id.* (quoting *Crosstex Energy Servs.*, 430 S.W.3d at 389 (quoting *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)).

"This Court may not impose its own judicial meaning on a statute by adding words not contained in the statute's language." *Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022) (quoting *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019)). We also "presum[e] that the Legislature intended for each of the statute's words to have a purpose and that the Legislature purposefully omitted words it did not include." *Id.* (quoting *Silguero*, 579 S.W.3d at 59). "The statutory words must be determined considering the context in which they are used, not in isolation." *Id.* (quoting *Silguero*, 579 S.W.3d at 59).

## III.    The Trial Court's Summary Judgment Was Proper

Martin's briefing characterizes this case as one of statutory construction.  Martin also urges that we should broadly interpret the term "tax abatement" while narrowly interpreting the term "grant" used in the key statute, Section 381.004 of the Texas Local Government Code.

### A.    Section 381.004 Is Not Ambiguous

Section 381.004 sets forth how counties can provide incentives to business, as follows:

> (g)    The commissioners court may develop and administer a program . . . for entering into a tax abatement agreement with an owner or lessee of a property interest subject to ad valorem taxation.  The execution, duration, and other terms of the agreement are governed, to the extent practicable, by the provisions of Sections 312.204, 312.205, and 312.211, Tax Code, as if the commissioners court were a governing body of a municipality.

> (h)    The commissioners court may develop and administer a program . . . for making loans and grants of public money and providing personnel and services of the county.

TEX. LOC. GOV'T CODE ANN. § 381.004(g), (h).

7

While the term "abatement" is not defined by the Texas Local Government Code, Black's Law Dictionary defines the term as "[t]he act of eliminating or nullifying." *Abatement*, BLACK'S LAW DICTIONARY (11th ed. 2019). The term is more commonly defined as "the act or process of abating : the state of being abated" or "an amount abated : *esp* : a deduction from the full amount of a tax." *Abatement*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006). Similarly, the term "abate" is defined as "to become defeated or become null or void" or "to decrease in amount or value." *Abate*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006). These definitions also square with the provisions of the Texas Tax Code referenced in subsection G.

Subsection G directly refers to Chapter 312 of the Texas Tax Code, also known as the Property Redevelopment and Tax Abatement Act (the Act).[4] TEX. TAX CODE ANN. § 312.001. Under the Act, "[a] taxing unit may not enter into a tax abatement agreement" unless certain criteria, such as the establishment of guidelines after public hearing and creation of a reinvestment zone, are met. TEX. TAX CODE ANN. § 312.002(a) (Supp.); *see* TEX. TAX CODE ANN. § 312.204. An "owner of property to which an agreement made under the . . . Act . . . applies is entitled to exemption from taxation by an incorporated city or town or other taxing unit of all or part of the value of the property as provided by the agreement." TEX. TAX CODE ANN.

---

[4]"The legislature by general law may authorize cities, towns, and other taxing units to grant exemptions or other relief from ad valorem taxes on property located in a reinvestment zone for the purpose of encouraging development or redevelopment and improvement of the property." TEX. CONST. art. VIII, § 1-g. "The legislature enacted the statutory predecessor to chapter 312, former article 1066f of the Revised Civil Statutes, to implement article VIII, section 1-g, a 1981 amendment to the Texas Constitution." Tex. Att'y Gen. Op. No. JC-0092, at 2 (1999) (footnote omitted) (citing Act of Aug. 10, 1981, 67th Leg., 1st C.S., ch. 5, § 9, 1981 Tex. Gen. Laws 53, 57 (former Article 1066f, Property Redevelopment and Tax Abatement Act, to take effect upon adoption of TEX. CONST. art. VIII, § 1-g)). The 1985 amendments to former Article 1066f provided counties with authority to enact tax abatement agreements. *Id.*

§ 11.28. As a result, based on both common understanding of the term "abatement" and the Texas Tax Code's language, a tax abatement either reduces or nullifies the requirement to pay taxes.

Next, there is nothing in the statutory language to suggest a special meaning for the term "grant." The term is defined as, "[t]o give or confer (something), with or without compensation." *Grant*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see Grant*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006) ("to bestow or transfer formally"). In the context used when reviewing the entirety of subsection H, and with the term "loan" coming before it, the use of the word "grant" refers to "something granted; *esp* : a gift (as of land or money) for a particular purpose." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006). Tax revenues are public funds. *See San Antonio Bldg. & Const. Trades Council v. City of San Antonio*, 224 S.W.3d 738, 746 (Tex. App.—San Antonio 2007, pet. denied) (citing Op. Tex. Att'y Gen. No. DM–489, at 1 (1998)).

We find no ambiguity in the language of Section 381.004. A plain reading of the statute shows that the Texas Tax Code governs the agreement "to the extent practicable," if a tax abatement applies, but does not govern if a county chooses to loan or grant public money. TEX. LOC. GOV'T CODE ANN. § 381.004(g).

## B. The Language of the Agreement

By three separate points of error, Martin challenges the trial court's summary judgment against her ultra vires claims based on violations of the Texas Tax Code. The resolution of Martin's argument depends on whether the Agreement is a subsection G tax abatement or a

9

subsection H loan or grant agreement. If it is the former, the Texas Tax Code applies. If it is the latter, the Texas Tax Code provisions that are the basis of Martin's ultra vires claims do not apply and the summary judgment was proper. We turn to the language of the Agreement to determine whether it was made under subsection G or subsection H.

It is undisputed that the Agreement was made under Chapter 381 and its express terms clarified that it was to stimulate business and commercial activity in Hopkins County. The Agreement stated that it was made for the following purposes and considerations on the Developer's part:

> **WHEREAS**, Developer intends to construct a solar farm (hereinafter referred to as the "Project") within the County and desires to participate in the economic development program established in this Agreement; and
>
> **WHEREAS**, Developer agrees to make a capital investment of more than **Two Hundred Forty Million and No/100 Dollars ($240,000,000.00)** towards the Project in the form of new business equipment, new business personal property, and new improvements to real property, not including inventory, in accordance with the terms of this Agreement; and
>
> **WHEREAS**, Developer agrees to create two (2) new Full-Time Equivalent Employment Positions working on the Property during the Term of this Agreement; and
>
> **WHEREAS**, the Developer desires to enter into this Agreement pursuant to Chapter 381 of the Texas Local Government Code (hereinafter referred to as "Chapter 381").

Both parties agree that Section 381.004 applies.

As for which subsection applies, we first note that the County's purposes and considerations in the Agreement indicated an intent to grant public funds when it stated,

> **WHEREAS**, the County desires to provide, pursuant to Chapter 381, an incentive to Developer to develop the Property as defined below; and

**WHEREAS**, the County has the authority under Chapter 381 to make loans or grants of public funds for the purposes of promoting local economic development and stimulating business and commercial activity within Hopkins County, Texas; and

**WHEREAS**, the County determines that a grant of funds to Developer will serve the public purpose of promoting local economic development and enhancing business and commercial activity within the County, and will further assist with economic development within the County; and

. . . .

**WHEREAS**, the County has concluded and hereby finds that this Agreement clearly promotes economic development in Hopkins County, Texas, and, as such, meets the requirements of Article III, Section 52-a of the Texas Constitution by assisting in the development and diversification of the economy of the state, by eliminating unemployment or underemployment in the state, and by the development or expansion of commerce within the state.[5]

Second, the Developer's obligations, excerpted in relevant part below, establish that the

Developer was required to pay ad valorem taxes:[6]

---

[5]Article III, Section 52-a of the Texas Constitution states,

Notwithstanding any other provision of this constitution, the legislature may provide for the creation of programs and the making of loans and grants of public money, other than money otherwise dedicated by this constitution to use for a different purpose, for the public purposes of development and diversification of the economy of the state, the elimination of unemployment or underemployment in the state, the stimulation of agricultural innovation, the fostering of the growth of enterprises based on agriculture, or the development or expansion of transportation or commerce in the state.

TEX. CONST. art. III, § 52-a. Whereas what is now Chapter 312 of the Texas Tax Code was enabled by Article VIII, Section 1-g, Article III, Section 52-a was the enabling provision for loans or grants of public funds provided that the county's program was "not secured by a pledge of ad valorem taxes or financed by the issuance of any bonds or other obligations payable from ad valorem taxes of the political subdivision" or did not otherwise create a debt on the part of a county. TEX. CONST. art. III, § 52-a; Tex. Att'y Gen. Op. No. KP-0261, at *2 (2019); Tex. Att'y Gen. Op. No. JC-0092, at *2 (1999).

[6]The Developer was also required to employ and retain two full-time equivalent employment positions and make sizable lump sum payments "each year equal to $800 multiplied by the Greater of: (i) the overall Nameplate capacity located in the County and (ii) 320 Megawatt AC." The Agreement provided an example suggesting that

(d)    . . . . Developer covenants and agrees beginning on **December 31, 2023**,[7] and during the Term of this Agreement, Developer shall deliver to County an annual compliance verification signed by a duly authorized representative of Developer that shall certify the following:

    (1)    The taxable appraised value of the Property and Personalty located on the Property for the applicable tax year; and

    (2)    the ad valorem taxes paid to the County for the Property and Personalty located on the Property for the applicable tax year.

(e)    **Payment of Ad Valorem Taxes.** Beginning with tax year 2023 and for each tax year thereafter during the Term of this Agreement, Developer shall pay by January 31st of each year during the Term of this Agreement all of the ad valorem taxes due for the previous year on the Personalty and Property attached to the project. Developer shall have the right to contest the appraised value of the Personalty and Property attached to the Project as provided by law. By exception to the above should Developer locate Personalty on the Property earlier than January 1st, 2023 Developer shall pay all the ad valorem taxes due for the tax year 2021 and 2022 on the Personality and Property by January 31st, 2023. Developer shall have the right to contest the appraised value of the Personality and Property as provided by law. . . .

In fact, failure to pay ad valorem taxes constituted an event of default, as shown by this section of the Agreement,

Each of the following shall constitute an Event of Default under this Agreement:

. . . .

(d)    **Ad Valorem Taxes**. Developer allows its ad valorem taxes owed to the County to become delinquent and fails to timely and properly follow the legal procedures for protest and/or contest of such taxes and to cure such failure within thirty (30) days after written notice thereof from County and/or Hopkins County Central Appraisal District is an Event of Default.

---

lump sum payments were estimated to be approximately $400,000.00 for the first year and $256,000.00 for remaining years.

[7]The Agreement required the Developer to obtain a certificate of completion for the Project by December 31, 2023.

Third, the Agreement established that the County would make a "Program Grant" or "Program Grant Payment," which was defined by the Agreement as "the economic development grants paid by the County to Developer in accordance with [the] Agreement, computed with reference to County ad valorem taxes assessed and collected for the Property and Personalty located on the Property." The County's obligations under the Agreement were as follows:

(a)    **Program Grant Payment.**

(1)    <u>Ad Valorem Taxes</u>.    During the Term of this Agreement, should Developer fail to maintain the following: (1) a Certificate of Completion . . . and (2) the minimum Full-Time Equivalent Employment Positions working at the Property . . . , then the County shall have no obligation to make a Program Grant Payment to Developer for the applicable tax year. The failure of Developer to satisfy the above-mentioned requirements for any tax year during the Term of this Agreement shall not prevent Developer from receiving a Program Grant Payment in future tax years consistent with this Agreement.

In the event, during the Term of this Agreement, Developer satisfies the requirements . . . of this Agreement, and the initial investment by Developer for the Property and Personalty located on the Property and the tax value of Personalty relocated to the Property by Developer is at least a combined **One hundred fifty million and no/100 dollars ($150,000,000.00)**, beginning with tax year 2023 and for each tax year thereafter during the Term of this Agreement as set out in the table below, the County shall make a Program Grant payment to Developer based upon the following percentages of County ad valorem taxes:

| Tax Year | Percentage of County Ad Valorem Taxes Reimbursed |
|---|---|
| 2023 | 100% |
| 2024 | 100% |
| 2025 | 100% |
| 2026 | 100% |
| 2027 | 100% |
| 2028 | 100% |
| 2029 | 100% |
| 2030 | 100% |
| 2031 | 100% |
| 2032 | 100% |

13

Notwithstanding the foregoing, the County shall have no obligation to pay Developer any Program Grant Payment until receipt of the Annual Compliance Verification . . . . The County covenants and agrees to provide each respective Program Grant Payment to Developer within thirty (30) days following receipt of the latter of: (1) ad valorem taxes paid to the County for the Property and Personalty for the tax year to which the respective Program Grant Payment corresponds; and (2) the Annual Compliance Verification.[8]

### C.    The Agreement Was for a Grant, Not a Tax Abatement

Despite the language of this Agreement, Martin argues that the 100 percent reimbursement constituted a tax abatement.[9] We disagree. The failure to pay the full amount of ad valorem taxes was expressly made an event of default under the Agreement. In our view, a plain reading of the Agreement established both that the Developer was required to pay the full amount of ad valorem taxes due each year and that it would not be entitled to any grant or reimbursement unless it did so and unless it met its other obligations under the Agreement, including maintaining two full-time equivalent employment positions.[10] Simply put, the Developer's obligation to pay taxes for each tax year was neither reduced nor nullified. As a

---

[8]The terms of the Agreement were structured in such a manner as to avoid a debt such as a pledge or bond.

[9]Martin argues that "County actors considered the Agreement's tax reimbursements to be more like a tax abatement than a grant." We note that, while the summary judgment evidence shows that County actors mistakenly referred to the agreement as a tax abatement, the question of whether the Agreement set out a tax abatement or a grant of money is a question of law that cannot be altered by such extrinsic evidence. *See In re N.L.W.*, 534 S.W.3d 102, 109 (Tex. App.—Texarkana 2017, no pet.) ("admissions of law are not binding on the court") (quoting *Neal v. Wisconsin Hard Chrome, Inc.*, 173 S.W.3d 891, 894 (Tex. App.—Texarkana 2005, no pet.)).

[10]Failure to make the sizable lump-sum payments also constituted an event of default.

result, we conclude that the Agreement specified a grant of public funds incentive, not a tax abatement incentive.[11]

Our conclusion is bolstered by an attorney general opinion penned in 1999. Tex. Att'y Gen. Op. No. JC-0092, at *1 (1999).[12] The issue submitted to the attorney general was whether the Texas Tax Code precluded the Dallas County Commissioners' Court from "mak[ing] payments to the [private] company that are the economic equivalent of an abatement of real property taxes." *Id.* Pursuant to an agreement like the Agreement here, Dallas County "promised to make yearly payments to the company for a ten-year period." *Id.* Also similar to the Agreement, the Dallas County agreement said that "[e]ach yearly payment [wa]s equal to fifty percent of the amount of property tax collected in that year by the county from the private company on the value of the real property above its 1996 value." *Id.* "The county's obligation to make these yearly payments [wa]s subject to . . . the private company's economic performance, as measured by a set increase in the total property value and either the company's total number of employees or annual payroll in Dallas County." *Id.* The attorney general concluded that "the payments at issue [in the Dallas County agreement were] not tax abatements" because "an owner who is a party to a tax abatement agreement does not pay the taxes that are abated pursuant to the agreement." *Id.* at *3 (citing TEX. TAX CODE ANN. § 11.28).

---

[11]Our conclusion that the County did not enter into a tax abatement agreement is dispositive of Martin's remaining arguments, which rely on the Texas Tax Code.

[12]"We may also be guided by reasoned interpretations of a statute by officials of the state executive branch, particularly the attorney general." *In re Smith*, 333 S.W.3d 582, 588 (Tex. 2011) (orig. proceeding). "The opinion of the attorney general is not binding on this Court, but it is often persuasive." *Id.*

15

As a result, the attorney general concluded that Chapter 312 neither authorized nor precluded the agreement made by Dallas County. *Id.* We likewise find that Chapter 312 does not govern.

Even so, Martin argues that "full reimbursement of a private party's ad valorem tax liability is inconsistent with the notion of a grant of public money."[13] We disagree. The reference to ad valorem taxes in the Agreement was simply the agreed-upon formula by which to calculate the amount of the program grant payment. Depending on future increases or decreases in the property value, the formula ensured that the County would never obligate itself to make payments over the amount of ad valorem taxes collected in the prior year, which could potentially create debt.

Also, at the time of the 1999 Attorney General opinion, Section 381.004 did not permit counties to loan or grant public funds, but the statute was amended in 2001 to authorize counties to loan or grant public funds, without an express amount restriction. *Id.* at *4, *6; *see* Act of May 25, 2001, 77th Leg., R.S., ch. 1154, § 1, 2001 Tex. Gen. Laws 2560, 2560 (amended 2003) (current version at TEX. LOC. GOV'T CODE § 381.004(h)). In 2019, the attorney general concluded that, "under subsection 381.004(h), neither that statute nor the state constitutional

_____

[13]Martin also argues that the reimbursement is unconstitutional because counties can make "loans and grants of public money, other than money otherwise dedicated by [the] constitution to use for a different purpose," and because "[a]ny bonds or other obligations of a county . . . issued for the purpose of making loans or grants" that are "payable from ad valorem taxes must be approved by a vote of the majority of the registered voters of the county . . . voting on the issue." TEX. CONST. art. III, § 52-a. The County and the Officials note that Martin failed to raise these arguments with the trial court. Under Rule 166a(c) of the Texas Rules of Civil Procedure, "[i]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c). Moreover, (1) Martin's ultra vires causes of action were limited to alleged failures to abide by the Texas Tax Code, (2) the trial court was not asked to determine the source of the funds, which could have been from segregated economic development funds or other funds on hand, and (3) nothing shows that bonds, pledges, or other obligations or debts were extended for the purpose of making grants that were payable from ad valorem taxes. *See Reeves Cnty., Tex. v. Pecos River Livestock, Inc.*, No. 08-99-00007-CV, 2000 WL 1433870, at *4 (Tex. App.—El Paso Sept. 28, 2000, no pet.) (not designated for publication).

provisions at issue impose durational or amount restrictions." Tex. Att'y Gen. Op. No. KP-0261, at *3 (2019). The attorney general also wrote that subsection H "leaves the duration and amount of economic development loans and grants to the commissioner court's budgetary discretion in the first instance, subject to the constitutional limitations" discussed in *Texas Municipal League Intergovernment Risk Pool v. Texas Workers' Compensation Commission*, 74 S.W.3d 377, 383 (Tex. 2002).[14] Tex. Att'y Gen. Op. No. KP-0261, at *3.

---

[14]In *Texas Municipal League Intergovernmental Risk Pool*, the Texas Supreme Court wrote:

> Article III, section 52(a) provides:
>
> > [T]he Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever. . . .
>
> TEX. CONST. art. III, § 52(a).
>
> We have held that section 52(a)'s prohibiting the Legislature from authorizing a political subdivision "to grant public money" means that the Legislature cannot require *gratuitous* payments to individuals, associations, or corporations. *See, e.g.*, *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995) (Edgewood IV); *Bexar Cnty. Hosp. Dist. v. Crosby*, 160 Tex. 116, 327 S.W.2d 445, 447 (1959); *Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699, 709 (1959); *Byrd v. City of Dallas*, 118 Tex. 28, 6 S.W.2d 738, 740 (1928). A political subdivision's paying public money is not "gratuitous" if the political subdivision receives return consideration. *Key v. Comm'rs Ct. of Marion Cnty.*, 727 S.W.2d 667, 668 (Tex. App.—Texarkana 1987, no writ) [(per curiam)].
> Moreover, we have determined that section 52(a) does not prohibit payments to individuals, corporations, or associations so long as the statute requiring such payments: (1) serves a legitimate public purpose; and (2) affords a clear public benefit received in return. *See Edgewood IV*, 917 S.W.2d at 740; *Bullock v. Calvert*, 480 S.W.2d 367, 370 (Tex. 1972) (citing *Davis v. City of Lubbock*, 326 S.W.2d 699 (Tex. 1959)); *Brazos River Auth. v. Carr*, 405 S.W.2d 689, 694 (Tex. 1966); *Byrd*, 6 S.W.2d at 740. A three-part test determines if a statute accomplishes a public purpose consistent with section 52(a). Specifically, the Legislature must: (1) ensure that the statute's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment; and (3) ensure that the political subdivision receives a return benefit. *See Atkinson v. City of Dallas*, 353 S.W.2d 275, 279 (Tex. Civ. App.—Dallas 1961, writ ref'd n.r.e.); *Gillham v. City of Dallas*, 207 S.W.2d 978, 983 (Tex. Civ. App.—Dallas 1948, writ ref'd n.r.e.).

17

The attorney general reasoned that "the Legislature expressly limited 'the execution, duration, and other terms' of tax abatement agreements entered into pursuant to subsection 381.004(g) by requiring compliance with specified Tax Code provisions, but did not limit the making of loans and grants under subsection 381.004(h) in the same way." *Id.* (citing TEX. LOC. GOV'T CODE ANN. § 381.004(g), (h)). Applying the "well-established" principle that "silence is intentional," "[w]hen the Legislature expresses its intent regarding a subject in one setting, but . . . remains silent on that subject in another," *id.* at *1 (quoting *Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 497 (Tex. 2013)), the attorney general found that "the limitations on tax abatement agreements stated in subsection 381.004(g) do not apply to loans and grants made pursuant to subsection 381.004(h)," *id.* at *4.

Martin argues that interpreting "Section 381.004(h)'s use of the term 'grant' so broadly as to include a reimbursement of ad valorem taxes would render the language of Section 381.004(g) meaningless and undermine the procedural protections of Chapter 312 of the Tax Code." Yet, in reviewing the plain wording of subsection H, as well as the attorney general's reasoning in the 2019 opinion, we find (1) that nothing precludes the program grant of public funds in the amount of the ad valorem taxes paid by the Developer as contemplated by the Agreement and (2) that the provisions of Chapter 312 of the Texas Tax Code do not apply to the Agreement.[15]

---

*Tex. Mun. League Intergovernmental Risk Pool*, 74 S.W.3d at 383–84. Martin has never argued that these requirements were not met.

[15]Last, Martin points to the following portions of a House Bill Analysis to support her argument that the Agreement contemplated a tax abatement: "Currently, municipalities make tax abatements such as rebates for taxes paid on real property to certain businesses. These incentives may draw businesses into the city, thereby stimulating economic

We find that there was no genuine issue of material fact with respect to whether the Agreement granted public funds. Because the Agreement was made under subchapter H, we conclude that the Texas Tax Code did not apply and that the County and the Officials established that they were entitled to judgment on Martin's ultra vires claims—all premised on alleged Texas Tax Code violations—as a matter of law. We conclude that the trial court properly granted summary judgment against Martin.

## IV.    Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:    November 2, 2022
Date Decided:      November 16, 2022

---

development. House Bill 2870 provides counties with the same authority." House Bill Analysis, Tex. H.B. 2870, 77th Leg., R.S. (2001). As Martin pointed out, because subsections G and H were added at the same time, this legislative history contributes little. *See* Act of May 25, 2001, 77th Leg., R.S., ch. 1154, § 1, 2001 Tex. Gen. Laws 2560, 2560 (amended 2003). Also, we find nothing ambiguous in the wording of Section 381.004, and as a result, we do not resort to the use of legislative history to interpret a clear statute. *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 435–36 (Tex. 2011) (Jefferson, C.J., concurring).

19