# Supreme Court of Texas

No. 22-1149

Roger Borgelt, Mark Pulliam, Jay Wiley, and the State of Texas,

*Petitioners*,

v.

Austin Firefighters Association, IAFF Local 975; City of Austin; and Marc A. Ott, in His Official Capacity as the City Manager of the City of Austin,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

JUSTICE BUSBY, joined by Justice Boyd and Justice Devine, dissenting in part and concurring in the judgment in part.

The Gift Clauses of the Texas Constitution exist to protect taxpaying citizens from their government, which our history shows is vulnerable to capture by private special interests who seek to use public funds for their own ends. That is what happened here.

The parties have stipulated that the Austin Firefighters Association is a private "labor union with organizational independence from" the City of Austin that represents most but not all city firefighters in collective bargaining and other employment-related matters. The

Association extracted the following promise from the City: to pay about $1.25 million in public funds to the Association's president and other authorized association representatives when they take time off from firefighting work to conduct association business that supports its mission. Their agreement recognizes that the Association's mission is distinct from the Fire Department's mission. And the agreement defines "association business" to include matters in which association representatives take actions adverse to the City. Thus, the City pays these representatives to bargain against it and to represent association members in contract grievances and disciplinary challenges.

I acknowledge the evidence that some association business serves important public purposes, including safety. But the record of the bench trial conclusively demonstrates that many actual uses of this paid time off either fall outside the agreement's broad definition of association business or otherwise promote the association's private interests. For example, association representatives have used paid leave to attend association PAC meetings and to support and oppose candidates for public office. And most of the agreement's few restrictions on paid leave have not been applied to the Association's president, who is off work all the time yet draws a full city salary. The City has employed no meaningful controls to separate the wheat from the chaff.

When a city pays some of its firefighters to perform work for an independent organization in this manner, it violates the plain terms of the Gift Clauses. The payments are commonly used for "private or individual purposes," especially political purposes, which shows that any notional government control over the paid time off has proven

2

woefully inadequate to protect the government's investment of public funds. TEX. CONST. art. XVI, § 6. For this reason alone, the trial court erred in rejecting the request by city taxpayers and the State to declare this portion of the agreement unconstitutional as implemented. I also have serious concerns about some reasons the Court gives for rejecting the argument that the payments are a "donation" or gratuitous "grant" in aid of a "private . . . association" because city taxpayers do not receive clear and sufficient consideration in return for the paid time off. *Id.* art. III, §§ 51, 52(a); *id.* art. XI, § 3.

The Court attempts to avoid declaring the payments unconstitutional by (1) recasting our precedent in a manner that unfortunately obscures what the words of the Gift Clauses require and (2) reinterpreting the agreement so that it will prohibit future expenditures the Court considers improper—something no party to the agreement or to this case has asked the Court to do. These maneuvers cannot erase the violations that have already occurred. And even if those violations were not conclusively established on this record, the Court's novel interpretation deprives the parties of fair notice and an opportunity to be heard regarding whether the Court's newly announced contractual controls were ever implemented by the City.

In essence, the Court fashions a paper tiger contract: as long as ambiguous wording can later be construed—and contrary wording recast—in a manner consistent with the Gift Clauses, it does not matter if the parties understood that contract differently and actually applied it in ways that violated the Clauses. I disagree. If the parties themselves did not think the agreement limited their private uses of

3

city-funded leave, courts should believe them and enforce the constitutional restrictions—not create contractual restrictions that are recognized by neither party and cannot be enforced by anyone else. Because the Court's decision today threatens to pull the Gift Clauses' teeth, I respectfully dissent from the Court's opinion and most of its judgment. Yet because I would grant the taxpayers and the State partial declaratory relief, I concur in the portion of the Court's judgment reversing the award of fees and sanctions against them.

## I

The Gift Clauses of the Texas Constitution broadly and repeatedly prohibit the State and its subdivisions from "giving," "grant[ing]," "appropriati[ng]," "donating," "subscribing," "lending," or "pledging" any "public money or thing of value" either (1) "in aid of, or to" "any individual, association or corporation whatsoever" or (2) "for private or individual purposes." TEX. CONST. art. III, §§ 50, 51, 52(a); *id.* art. XI, § 3; *id.* art. XVI, § 6(a). "Our goal when interpreting the Texas Constitution is to give effect to the plain meaning of the text as it was understood by those who ratified it." *In re Abbott*, 628 S.W.3d 288, 293 (Tex. 2021). Cases interpreting the clauses have so far said little about how the ratifiers would have understood them, though the Court today sketches some of the Gilded Age practices that the clauses presumably were intended to stop. But our cases closest to the time of ratification did hew closely to the plain meaning of the text. Our more recent cases? Not so much.

In 1920, for example, we remarked in *Bexar County v. Linden* that "[n]o feature of the Constitution is more marked than its vigilance for

4

the protection of the public funds and the public credit against misuse," as shown by its "numerous provisions" with "broad" language. 220 S.W. 761, 761 (Tex. 1920). "The giving away of public money, its application to other than strictly governmental purposes, is what [the Gift Clauses are] intended to guard against." *Id.* at 762. The Clauses' "prohibition is a positive and absolute one," which denies government "any power to grant or to authorize the grant of public money." *Id.* Thus, if "the effect of the [challenged provision] is to bestow [public] funds . . . as a gratuity, *or* for uses not related to . . . governmental duties, it would be invalid." *Id.* (emphasis added).[1]

Recognizing the breadth and strictness of these limits, the people of Texas have repeatedly amended the Constitution to authorize specific expenditures of public funds for private purposes when they have concluded as a policy matter that it is appropriate to do so.[2] The Constitution assigns this power to decide what it *should* say to the people and their elected legislators, not to judges sworn to protect the

---

[1] *See also, e.g.*, *State v. City of Austin*, 331 S.W.2d 737, 742 (Tex. 1960); *Seydler v. Border*, 115 S.W.2d 702, 706 (Tex. Civ. App.—Galveston 1938, writ ref'd) (applying *Linden*'s "strictly governmental purposes" standard); *Jones v. Alexander*, 59 S.W.2d 1080, 1083 (Tex. [Comm'n App.] 1933) ("The Constitution prohibits the Legislature from appropriating the public money to other than strict governmental purposes."); *City of Tyler v. Tex. Emps. Ins. Ass'n*, 288 S.W. 409, 412 (Tex. Comm'n App. 1926, judgm't adopted).

[2] *See, e.g.,* TEX. CONST. art. III, § 51-a-1 (amending on November 7, 1989, to authorize financial assistance to local fire departments and other public firefighting organizations); *id.* § 51-c (amending on November 6, 1956, to authorize aid and compensation to persons improperly fined or imprisoned); *id.* § 51-d (amending on November 8, 1966, to authorize payment of assistance to survivors of public servants who suffered death in performance of hazardous duties).

5

Constitution as it exists. *See* TEX. CONST. art. XVII; *McCombs v. Dallas County*, 136 S.W.2d 975, 981 (Tex. Civ. App.—Dallas 1940, writ ref'd) (explaining that general constitutional prohibition on expenditures controls absent special constitutional provision authorizing expenditure at issue).

Our recent cases have usurped this power, transforming *Linden*'s plain-text approach to the Gift Clauses into the hodgepodge of overlapping multi-factor tests that the Court describes. *See, e.g., ante* at 14-15 & n.14; *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383-84 (Tex. 2002) [hereinafter *TML*].[3] Because this development has not been tied to constitutional text, Texans are left to guess when a court may consider it appropriate to apply the Gift Clauses and when an amendment may be necessary. *See TML*, 74 S.W.3d at 389-392 (Owen, J., dissenting).

These wishy-washy cases have stunted the formerly healthy constitutional dialogue between Texas citizens and their legislators about when public funds may be given away, encouraging governments and taxpayers alike to look to courts and to the Attorney General for answers that we are neither constitutionally elected nor well-suited to provide. Texas has chosen a republican constitutional system that expressly separates and limits government power and reserves important rights to the people. *See* TEX. CONST. art. I, § 2; *id.* art. II, § 1; *id.* art. XVII. Courts interpreting such a Constitution keep the system

---

[3] This phenomenon is not unique to the Gift Clauses: our decisions have similarly muddled the Constitution's twin jury-trial guarantees. *See, e.g., In re Troy S. Poe Tr.*, 646 S.W.3d 771, 781 (Tex. 2022) (Busby, J., concurring).

vital by staying in our lane and drawing clear text-based lines that require other constitutional actors to do their own assigned jobs, hard as they may be. We must not arrogate more power to ourselves, or permit these other actors to abdicate their responsibilities in favor of the judicial branch, by sending murky messages about where the boundaries lie.

With the hope that better days are ahead for our jurisprudence on the Gift Clauses, I encourage interested parties, attorneys, historians, and other *amici* to help us explain their meaning clearly based on the text as understood by its ratifiers.[4] But as the Court observes, the parties in this case have not pressed a request that we reexamine our precedent. Thus, like the Court, I apply that precedent here. Our recent cases do retain some textual touchstones, as I explain below.

The Court begins by setting its sights on a narrower but perhaps equally challenging objective: to reformulate those cases' tests for determining when a transfer of public money violates the Gift Clauses. Unfortunately, the Court's reformulation obscures that the Gift Clauses impose at least two distinct textual requirements for any payment, loan, or pledge of public funds by the State or one of its political subdivisions to or for the benefit of a private individual, association, or corporation. ***First***, the payment cannot be a "donation" or gratuitous "grant," TEX. CONST. art. III, §§ 51, 52(a); *id.* art. XI, § 3, which our cases have said requires "sufficient . . . return consideration" that clearly benefits the

---

[4] *See Poe Tr.*, 646 S.W.3d at 782 (Busby, J., concurring).

subdivision's taxpayers.[5] **Second**, the payment must at least predominantly serve a legitimate public purpose[6] rather than "private or individual purposes," *id.* art. XVI, § 6, which we have explained includes the retention of sufficient "public control" over the funds to "ensure that the public purpose is accomplished and to protect the public's investment."[7]

The court of appeals found our precedent unclear regarding whether it is "enough to determine that [a] payment is not gratuitous." 684 S.W.3d 819, 829 (Tex. App.—Austin 2022). But we answered that question a century ago in a manner consistent with the Gift Clauses'

---

[5] *TML*, 74 S.W.3d at 383-84 (explaining that "[a] political subdivision's paying public money is not 'gratuitous' *if the political subdivision* receives return consideration" that is a "clear public benefit" and, although such return consideration need not necessarily be "equal," it must be, at minimum, "sufficient" (emphases added)); *id.* at 384 (holding government must "ensure that the political subdivision receives a return benefit"); *see also Am. Precision Ammunition, L.L.C. v. City of Mineral Wells*, 90 F.4th 820, 826 (5th Cir. 2024) (holding agreement did not indicate any return benefit in exchange for city's payment). Sufficient return consideration must be received by the relevant political subdivision that authorized the payment. *Cf. Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995) (upholding transfer of funds outside school district where "voters *in the school district*" received benefit in return (emphasis added)); *Brazos River Auth. v. Carr*, 405 S.W.2d 689, 694 (Tex. 1966) (upholding transaction that "redounds to the benefit of the public which is served by the [Brazos River] Authority").

[6] *TML*, 74 S.W.3d at 383-84.

[7] *TML*, 74 S.W.3d at 384; *see also Davis v. City of Lubbock*, 326 S.W.2d 699, 702, 707 (Tex. 1959); *Corsicana Indus. Found., Inc. v. City of Corsicana*, 685 S.W.3d 171, 178 (Tex. App.—Waco 2024, pet. filed); *Key v. Comm'rs Ct. of Marion County*, 727 S.W.2d 667, 669 (Tex. App.—Texarkana 1987, no pet.); Tex. Att'y Gen. Op. No. MW-89, 1979 WL 31300, at *2 (1979). The Court recounts the history that led to this requirement of public control. *Ante* at 13 n.11.

plain text: the payment is prohibited unless both requirements are met. *Linden*, 220 S.W. at 762 (recognizing that the Gift Clauses prohibit payment of public funds "as a gratuity, *or* for [nonpublic] uses" (emphasis added)).

## II

In applying the Gift Clauses' requirements, I agree with the Court that our focus should be on Article 10 of the agreement, which provides for the paid leave in question. *Ante* at 17-18. As the Court explains, analyzing these requirements at the level of the agreement as a whole would lead to absurd results: for example, as discussed at oral argument, the City could agree to buy a red Ferrari for the Association president because another provision of the same agreement obligates firefighters to provide firefighting services that benefit Austin taxpayers. That approach would render the Gift Clauses meaningless.

With this focus and the presumption of constitutionality in mind, I conclude the challengers carried their burden to prove that Article 10 leave payments violated the Gift Clauses' requirements. The trial court should have rendered judgment for the taxpayers and the State, declaring the Article 10 payments unconstitutional as implemented.

## A

The City violated the Gift Clauses by providing publicly funded leave to conduct association business because the City did not actually "retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment." *TML*, 74 S.W.3d at 384. Instead, the trial record conclusively shows that leave is either

9

unmonitored or rubber stamped and has been commonly used for private purposes, including association political activities.

Texas courts have not had many opportunities to address this control requirement, but it is clear that the test is not merely whether the documents governing the payment—like the Soviet Constitution[8]— have the right words on paper that *allow* control. Of course, a Gift Clause violation will occur if the government does not even have the option to control how the payment is used. *E.g.*, *Tex. Pharm. Ass'n v. Dooley*, 90 S.W.2d 328, 330 (Tex. Civ. App.—Austin 1936, no writ) (holding law void that "directs [public funds] be paid over to a private corporation, not under the control of the Board of Pharmacy, nor regulated by the act itself").

But the Gift Clauses also demand more: the government must *require* that the funds serve a public purpose by actually implementing "adequate contractual or other controls" to "*ensure* its realization." Tex. Att'y Gen. Op. No. MW-89, 1979 WL 31300, at *2 (1979) (emphasis added); *TML*, 74 S.W.3d at 384 (holding government "must . . . retain public control . . . to ensure that the public purpose is accomplished"). "Long before the *Texas Municipal League* decision, when determining the constitutionality of any provision authorizing use of public funds

---

[8] As Justice Scalia memorably observed in several speeches, the Soviet Constitution contained a much more robust bill of rights than the American one; but it was merely "words on paper, what our Framers would have called a parchment guarantee." *Considering the Role of Judges Under the Constitution of the United States: Hearing Before the S. Comm. on the Judiciary*, 112th Cong. 6-7 (2011) (statement of Antonin Scalia, Associate Justice, Supreme Court of the United States) (citing THE FEDERALIST NO. 48 (James Madison)).

committed in furtherance of some public purpose, courts have considered whether the governmental entity properly supervised and controlled the enterprise." *Corsicana Indus. Found., Inc. v. City of Corsicana*, 685 S.W.3d 171, 178 (Tex. App.—Waco 2024, pet. filed) (citing cases); *see Byrd v. City of Dallas*, 6 S.W.2d 738, 741 (Tex. [Comm'n App.] 1928) (considering whether "maladministration" of the funds had been shown). Put simply, "continuing public control" over "the performance of the contract" is "*necessary* to insure that the [government] receives its consideration: accomplishment of the public purpose." *Key v. Comm'rs Ct. of Marion County*, 727 S.W.2d 667, 669 (Tex. App.—Texarkana 1987, no pet.) (emphasis added).[9]

We must apply this legal standard to the facts regarding the parties' implementation of Article 10, not merely to that article as written or as construed by the Court. The taxpayers and the State sought a declaration that the City has granted benefits under Article 10 in violation of the Gift Clauses, and the trial court denied respondents' motion for summary judgment in part with regard to the City's implementation of the agreement. The court then conducted a bench trial on that issue and concluded that the City's implementation did not violate the Gift Clauses. The taxpayers and the State challenge this conclusion on appeal, arguing that the record shows conclusively that

---

[9] The Court agrees that the Gift Clauses cannot be "honored in name yet ignored in practice." *Ante* at 3. And I agree with the Court that "errant one-off" failures to apply controls would not constitute a Gift Clause violation. *Id.* at 29. But there is no need for fine line-drawing here. As discussed below, the record conclusively shows that there were wholesale failures to use the few controls the parties thought they had and no attempts to use the new controls the Court discerns in the agreement today.

11

the City did not exercise meaningful control over actual use of the leave in practice. I agree that the record supports their challenge.

Article 10 creates two types of leave in separately numbered paragraphs: one for the Association's president, who is always on city-funded leave to conduct "any lawful association business activities consistent with the Association's purposes"; and another for other association representatives, who may use leave for specified "Association business activities that directly support the mission of the Department or the Association, but do not otherwise violate the specific terms of this Article." The evidence showed that neither was subject to adequate public "control over the performance of the contract" to ensure the leave accomplishes a predominant public purpose. *Id.* at 669.

Regarding the Association's president, the trial record conclusively establishes that the City had no say in who was appointed to the position, could not remove him, did not direct his activities during the relevant time, did not supervise or even review his performance, and placed no prohibitions on his work for the Association. More importantly, both the City's representative and the president himself admitted that he did not—and was not required to—describe on his timesheets how he used his paid leave. Thus, there was no way for the City to monitor that use, and it never disapproved any use of leave by the president. The president was in essence a publicly funded full-time employee of the Association who did no work for the Fire Department.[10]

---

[10] The court of appeals observed that the president was also a Department employee and could be fired from the latter position, 684 S.W.3d at 836, but that does not give the City authority to rewrite the agreement to restrict how he—or any successor—uses the leave while serving as president.

12

Similarly, the record shows that the publicly funded activities of other authorized association representatives approved by its president and executive board were not controlled or directed by the City. Over 75 percent of their leave time was reported to the City simply as "other association business," which is not even a category of leave recognized by the agreement. And the fire chief's designee tasked with reviewing the association-approved requests to use leave rubber stamped 99 percent of them, many of which did not contain a statement of purpose that would permit meaningful review.[11] That outcome is unsurprising, as Article 10 provides that the Chief "shall approve timely [leave] requests, subject only to the operational needs of the Department," and the City's governing policy provided that timely "[r]equests for authorized ABL from the Association . . . are automatically approved" subject to operational needs.

In short, no reasonable factfinder could determine that this process "ensure[s] that [a] public purpose is accomplished" by the leave or "protect[s] the public's investment" in this private association. *TML*, 74 S.W.3d at 384. Instead, the City's representative testified and the president himself admitted that he routinely used publicly funded leave for political activities like supporting and opposing candidates for election, preparing and providing endorsements, and arranging for

---

[11] The Court mentions that the chief's designee did deny leave to other association representatives—but not the president—in a few instances. Specifically, he testified that he denied about one percent of requests. But as discussed below, he testified at trial that he routinely approved use of leave by these representatives for association PAC meetings—which Article 10 expressly prohibits.

13

placement of political signs, and he spent twenty-five to thirty percent of his leave time lobbying the City Council and the Legislature.[12] Other authorized association representatives were regularly approved to use leave to participate in meetings of the Association's political action committee even though Article 10 expressly says leave "shall not be

---

[12] This point is not simply a matter of my "beliefs." *Compare ante* at 32-33 n.30, *with* 4 RR 66-69, 144; 5 RR 98, 101, 123; 2 SCR 470-71. For example, the City's representative testified that the president "does, in fact, while he's utilizing [leave], conduct political activities" and "lobbying activities" despite "policies that you can't on City time conduct political activities." In the City's view, "there was only ever one restriction" on the president's use of leave for political activities, which was "that he could not on [leave] hand off money, checks, things like that to candidates."

Turning to the president, although he responded evasively at trial when confronted with several answers he had given at his deposition, he eventually admitted that "25 to 30 percent of [my] time" is "spent on lobbying activities" with the City Council and Legislature. He also acknowledged that he and other association members "when they're on duty . . . would use [leave] for those [PAC] meetings," where they "discuss . . . and decide what recommendations the PAC board is going to make regarding political issues, referendums, or candidates," including "supporting candidates for political office" and deciding "whether to give political contributions." And the president conceded that he "prepare[s] endorsement or opposition statements for political candidates" and "I do it during my work week." Similarly, he said "during the regular business hours, the work week, do I write a check for somebody to put out [political] signs? Yes, that is true."

The president also voiced his belief that these activities should not be considered part of his leave "because my work week well exceeds 40 hours." But he also testified that he does not "receive overtime for work over 40 hours," which is "time I'm volunteering as part of the duties of my position." In any event, the trial court did not base its decision on this legal question about whether after-hours work can somehow replace, for leave purposes, political activity conducted during business hours. The court did not mention the matter in its conclusions of law.

utilized for legislative and/or political activities that are sponsored or supported by the Association's Political Action Committee(s)."[13]

The Court responds that the taxpayers and the State have not challenged any particular factual findings by the trial court. This response fails to blunt the force of the conclusive evidence I have just summarized for three reasons. First, there are no findings that directly address whether the City actually exercised control sufficient to ensure that the leave was used for public purposes. For example, the trial court found that the City was "not aware" of any uses of leave for political or other private purposes, but that head-in-the-sand approach is precisely the constitutional deficiency. Second, even if there were such findings, they would be contrary to the conclusively established facts I have just recounted. And third, now that the Court has reinterpreted Article 10 to permit even greater control that the City failed to exercise, the trial court's findings are immaterial because they are based on the wrong legal standard.

In particular, the Court concludes that Article 10's authorization of paid leave should be interpreted far more narrowly than the parties to the agreement and to this case have, and that the fire chief "should deny" future leave requests outside that scope and "may" discipline those who misuse leave in violation of the agreement. *Ante* at 19, 23-24, 31-32. But that will not fix the problem: language in Article 10 expressly

---

[13] *See* 4 RR 91-96, 139-40; 7 RR 453; 2 SCR 546-568. The Court describes this evidence as merely things the taxpayers and the State "allege" or "say," and it implies that these uncontrolled uses may have occurred only "on errant one-off occasions." *Ante* at 6-7, 29. The documentary evidence of approved leave requests for PAC meetings shows otherwise.

permits using publicly funded leave for some political and lobbying purposes, and no language prohibits its use to support the association fundraising activities the Court questions today, so there will be no basis for either discipline or denial of leave.[14]

More importantly, the Court's forward-looking response misses the present point of this case: the City has already made many uncontrolled payments to aid the Association in accomplishing its own private purposes. The Gift Clauses are violated when a government entity routinely "give[s]," "donates," or "grant[s] public money" to a "private . . . association" without the controls necessary to prevent its use "for private or individual purposes." TEX. CONST. art. III, §§ 50, 51, 52(a); *id.* art. IX, § 3; *id.* art. XVI, § 6.

This is a practical, facts-on-the-ground inquiry that deals in past occurrences and present realities: nothing in the constitutional text or our precedent suggests that it matters one whit whether the payments of public funds were in accordance with or contrary to a court's later thoughts about how the parties to a contract should have interpreted and applied it. Payments that violate the Clauses need not be made under a contract at all, and if they were, it is no defense that the payments repeatedly breached the contract—to the contrary, such evidence proves the ineffectiveness of any contractual controls. *See TML*, 74 S.W.3d at 384. Because the record conclusively shows that the City did not limit leave to public purposes, the taxpayers and the State

---

[14] Indeed, there is no language in the agreement or policies authorizing the chief to deny any leave to the Association's president.

are entitled to their requested declaration that leave payments under Article 10 violated the Gift Clauses.

Put another way, the Court's *sua sponte* reinterpretation of the agreement to allow or require additional controls just makes it even more clear that the City utterly failed to use those controls to ensure that a public purpose is accomplished. The evidence conclusively shows that the fire chief's designee did not apply Article 10's limits on leave for other authorized association representatives to the president, *cf. ante* at 23-24 & n.21; indeed, it applied no limits to his leave whatsoever. Nor is there any evidence that the chief's designee categorically denied leave for activities that "lack[ed] a clear nexus to a predominant and legitimate public purpose," *id.* at 28, or even that he could do so on a tight timeline given the limited information available to him. For example, the record conclusively shows that he approved leave for "fishing fundraisers, boxing matches, parties, and the like" without inquiring whether those activities predominantly advanced a public purpose. *Id.* at 28.[15]

Even if this record did not conclusively establish the failure to use controls, the parties to the agreement and to this litigation can hardly be faulted for failing to anticipate the Court's new understanding of the controls Article 10 requires, which none of them requested. In circumstances where the governing legal standard changes on appeal, particularly in a manner that no party advocated in the trial court, the

---

[15] Like the Court, I would not go so far as to hold that the fundraising events are prohibited at this juncture. *See ante* at 29 n.24; *infra* Part II.B. The record includes evidence that proceeds from these events were used to benefit the public, though there is no indication the chief's designee knew that.

17

parties generally should receive a fair opportunity on remand to be heard and present tailored evidence addressing whether that standard was met.[16]  The Court's contrary approach deprives the parties of due process.  *See Byrd v. Blue Ridge Elec. Co-op., Inc.*, 356 U.S. 525, 531-32 (1958) (holding party "cannot be penalized by the denial of his day in court to try the issue under the correct interpretation").

Turning to whether the taxpayers and the State are also entitled to an injunction against continued payments under Article 10, I agree with the Court that we should consider whether the City will abide by the agreement's terms going forward.  *Ante* at 30.  But "[a] defendant's cessation of challenged conduct does not, in itself, deprive a court of the power to hear or determine claims for prospective relief."  *Matthews v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416, 418 (Tex. 2016).  Instead, the defendant bears a "heavy" burden to show that "subsequent events make absolutely clear that the challenged conduct could not reasonably be expected to recur."  *Id.* (internal quotation marks omitted).

---

[16] *E.g.*, *Carowest Land, Ltd. v. City of New Braunfels*, 615 S.W.3d 156, 158-59 (Tex. 2020) (explaining that "[t]he most compelling case for a remand in the interest of justice is where we overrule existing precedents on which the losing party relied at trial" (internal quotation marks omitted)); *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (holding that "[t]o ask the [fact finder] to resolve this [factual] dispute without a proper legal definition to the essential legal issue was reversible error" and remanding for new trial); *Coker v. Coker*, 650 S.W.2d 391, 392, 394-95 (Tex. 1983) (remanding for trial where both parties were mistaken regarding interpretation of governing contract language); *W. Union Tel. Co. v. Midgett*, 251 S.W. 253, 257 (Tex. Civ. App.—Beaumont 1923, no writ) ("The case having been tried upon an incorrect interpretation . . . , the cause ought to be remanded, unless we are able to say that the record shows with reasonable certainty that appellees will not be able to establish by proof the cause of action [under the correct interpretation], and we cannot so say.").

The City cannot make that showing here. Throughout this litigation, the City has not indicated any willingness to modify its Article 10 leave practices. And even if I agreed with the Court about what the new terms of the agreement are, which I do not, there is no certainty that compliance with those terms would abate the Gift Clause violations. Instead, as I have explained, the Court's terms provide no basis for discipline or denial of leave for many of the private purposes at issue. Accordingly, I would render judgment granting the taxpayers and the State declaratory relief that the implementation of Article 10 violated the Gift Clauses and remand for further proceedings regarding the need for injunctive relief and their request for attorney's fees.

**B**

Finally, I disagree with some of the reasons the Court gives for rejecting an alternative theory offered by the taxpayers and the State: that Article 10 payments violate the Gift Clauses because using public funds to pay firefighters to work for the Association is a gratuitous grant in aid of a private entity, which does not provide Austin taxpayers with a clear and sufficient benefit in return for that work. *See TML*, 74 S.W.3d at 383-84. The court of appeals emphasized that the Legislature has statutorily granted firefighters the right to organize for collective bargaining with cities regarding their compensation and other conditions of employment. *See* TEX. LOC. GOV'T CODE § 174.002(b). But we presume that the Legislature did so knowing that the Constitution's Gift Clauses limited the kinds of substantive terms that cities had the authority to accept through the collective bargaining process. *See In re Tex. Educ. Agency*, 619 S.W.3d 679, 687-88 (Tex. 2021).

19

In other words, a city cannot give away public funds to non-employees just because it agrees to do so as part of a collective bargaining agreement with its employees. The Supreme Court of the United States has drawn a similar distinction, holding that an interest in "labor peace" does not support compelling employees to subsidize public-sector unions at the expense of their constitutional rights to freedom of association. *Janus v. Am. Fed'n of State, County, & Mun. Emps., Council 31*, 585 U.S. 878, 895-96 (2018). Neither should that interest support obligating taxpayers to subsidize unions at the expense of constitutional restrictions on how their taxes may be spent.

The Court, for its part, contends that there is sufficient return consideration for the Article 10 payments in part because firefighters who receive their ordinary salaries and benefits from the City are simply performing business activities related to their employment that advance the interests of the Fire Department. *Ante* at 18-19. But as the Court itself recognizes elsewhere, this case challenges only paid leave to work for the Association under Article 10, which must be considered separately from the ordinary salaries and benefits of firefighters under Article 9. Moreover, accepting the Court's suggestion that Article 10 payments to perform work for the Association are "a negotiated benefit available to *all* City firefighters, including those who are not members of the union," *id.* at 26, would mean that the agreement requires nonmembers to use part of their compensation to subsidize private

union activities they may not support—a violation of the First Amendment.[17]

Nevertheless, I agree with the Court that under a narrow paid-leave provision structured the way the Court views this one, individual firefighters would be more likely to use leave to help the department better serve the public, maintain a productive employment relationship with the City, and promote firefighter safety, *ante* at 24-28—uses that arguably provide a sufficient return benefit to Austin taxpayers. Given the lack of briefing from the parties regarding the constitutionality of such an agreement, I am not prepared to hold today that the agreement would, on its face, violate the Gift Clause on the alternative ground that it did not provide taxpayers with sufficient return consideration.

## III

The taxpayers and the State have proven conclusively that Article 10 grants public funds to aid a private association without implementing controls to ensure that the funds predominantly serve legitimate public purposes. Accordingly, the trial court should have rendered judgment in their favor, declaring that Article 10 leave was implemented in violation of the Gift Clauses. Because the Court affirms

---

[17] *See Janus*, 585 U.S. at 893 ("Compelling a person to *subsidize* the speech of other private speakers raises similar First Amendment concerns."); *id.* (recognizing "that a significant impingement on First Amendment rights occurs when public employees are required to provide financial support for a union" (internal quotation marks omitted)); *id.* at 930 (holding it violates the First Amendment to collect a "payment to [a public-sector] union . . . from a nonmember's wages . . . unless the employee affirmatively consents to pay").

the trial court's contrary judgment, I respectfully dissent. I concur in the court's judgment reversing the award of fees and sanctions against the taxpayers and the State, however, and I would remand for the trial court to consider their requests for fees and injunctive relief.

_____
J. Brett Busby
Justice

**OPINION FILED:** June 28, 2024